

Brian K. Garries
#11388-045
USP/POLLOCK
P.O. BOX 2099
POLLOCK, LA
    71467-2099

# ORIGINAL



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVAN
HARRISBURG DIVISION

| | | |
|---|---|---|
| BRIAN K. GARRIES, a/k/a, | § | |
| PHARAOH O. NKOSI | § | CIVIL NO. 1:CV-01-1119 |
| VS. | § | (JUDGE KANE) |
| DONALD ROMINE, WARDEN, | § | |
| Respondent | § | |

## PETITIONER'S PRO SE MOTION TO SUPPLEMENT PLEADINGS
## PURSUANT TO RULE 15 FED. R . CIV. PROC

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW BRIAN K. GARRIES, Pro se petitioner, who motions this
Honorable Court for an Order permitting him to file supplemental
pleadings in this named and numbered cause pursuant to Ruel 15 of
the Fed. R. Civ. Proc.

   This supplemental pleading is necessary in order that petitioner
may file all available issues for this court to review, and to
insure that justice is received where petitioner has alleged that
he was denied his sixth amendment right toeffective assistance of
counsel

   WHEREFORE, Petitioner prays this Court enter an order granting
him permission to file the attached supplemental brief.

*Phrud O-Nkco  A:KA*
*Bri R Grier*

23 Aug 2001

BRIAN K. GARRIES
#11388-045
USP/POLLOCK
P.O. BOX 2099
POLLOCK, LA
    71467-2099

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
## HARRISBURG DIVISION

| | | |
|---|---|---|
| BRIAN K. GARRIES, a/k/a | § | |
| PHARAOH O. NKOSI | | CIVIL NO. 1:CV-01-1119 |
| VS. | § | |
| DONALD ROMINE, WARDEN, | § | (JUDGE KANE) |
| Respondent | § | |

## ORDER

Came on this date to be considered petitioner Brian K. Garries, Motion to Supplement his pleadings pursuant to Rule 15, of the Fed. R. Civ. Proc. This Court finds that in the interest of justice, and that respondent will not be prejudiced by the supplement, and after due consideration, this Court is of the opinion that petitioner's motion to supplement should be granted in the interest of justice. It is, therefore Ordered that Petitioner's motion be, and in all things be granted ___or_____ denied.

SIGNED this _____day of _____,2001

_____
U.S DISTRICT JUDGE OR MAGISTRATE JUDGE

## ARGUMENT FOUR

**WHETHER PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL FOR THE FAILURE OF HIS APPELLATE COUNSEL TO RAISE TRIAL COUNSEL'S INEFFECTIVENESS ON APPEAL FOR FAILURE TO PREPARE FOR TRIAL, FOR FAILURE TO TEST ALL AVAILABE BLOOD EVIDENCE AND FOR FAILURE TO SUBPOENA OR HIRE AN EXPERT FORENSIC SEROLOGIST TO TEST AND CHALLENGE GOVERNMENT'S EXPERT ROY L. TUBERGEN'S TESTIMONY AND TESTING PROCEDURES AND CONCLUSIONS OF BLOOD EVIDENCE**

## Standard of Review:

Ineffective assistance of counsel is a mixed question of law and fact de novo **Washington V. Murray**, 952 F.2d 1472 (4th Cir.1991); **Strickland V. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984).

## ARGUMENT

In the instant case petitioner Garries was charged with the offense of murder, the murder of his wife Camille Garries. The government in chief relied on blood evidence and the trial testimony of FBI agent Roy L. Tubergen a forensic serologist expert, to obtain the conviction of petitioner. From a reading of the trial transcripts it is clear that petitioner was denied effective assistance of counsel during his trial proceedings, where it is clear that his counsel did not adequately prepare for the introduction of blood identification, failed to adequately cross-examine Tubergen through the use and presentation of already published medical material such as "The Principles and Practice of Blood Grouping, 2nd. Ed.,A, Enskine and W. Socha, 1978, C.V. Mosby Company, pg. 61.; Wiener. A.S. American Journal of Clinical Pathology, 51, 9, 1969, such material would have contradicted Tubergen's trial testimony. Counsel's failure to request and obtain Tubergen's laboratory notes,

which explained which test Tubergen had performed, how the test were conducted and for failure of counsel to obtain copies of Tubergen's testimony given at the 39(a) session months prior to trial and for his failure to present such to an expert forensic serologist to evaluate and call to trial to rebut Tubergen's testimony as to findings denied petitioner effective assistance of counsel. This is so because months prior to petitioner's trial, there was an Article 39(a) session held in which Roy L. Tubergen the government's forensic serologist testified at. Tubergen testified that he received a vail of blood described as comming from camille Garries the victim (*Tr. 212), Tubergen further testified that he tested the known blood sample and determine that Camille Garries belong to blood group B, enzyme PGM 2-1 (*Tr. 213), Tubergen testified as to the chemical testing done on blood evidence sent to him (*Tr. 214-226) however, Tubergen never testified with respect to the masking of blood, where blood can be type A, type B, type AB, or type O. Using a "thread" or "antigen" test, a reagent called anti-A is added to the blood and agglutination (clumping) occurs if the blood is type A. Similar regents signal the presence of type B and of type AB, when Tubergen was question as to what percentage of the population that group B blood is present he agreed with 10%, and that 36% of the population (people) would have PGM 2-1 (*227,228), finally Tubergen was questioned as to whether a dog could have B-antigen or ABO characteristics that human's do, Tubregen's response was I doubt it (*243 - 244)

Dr. Kier, is a forensic chemist who testified for petitioner at the 39(a) session prior to trial (*Tr.257 - 279) During the 39(a) Session Dr. Kier, was shown exhibit 8, a prosecution piece

2.

of evidence. Dr. Kier was questioned as to whether or not if he had seen or performed test on exhibit 8. Dr. Keir answered no. However, Dr. Keir was then asked to examine the evidence to see if he could see the presence of blood on the exhibit, in which Dr. Keir did in fact see what seemed to be the presence of blood stains, where in his words appeared to be suspicious blood that would require further testing and testing should be conducted (*Tr. 279). It is evident that petitioner's counsel did not appreciate the significance of , the 39(a) session, where counsel did not use the testimony of agent Tubergen to prepare for trial, did not follow the recommendation of his own expert witness in conducting test on exhibit 8, for blood evidence that might rebut governments findings. At petitioner's trial agent Tubergen testified to the same facts as he did in the 39(a) session. Petitioner's counsel could not refut such testimony because counsel did not take advantage of the testiomny given by Tubergen at the 39(a) session and research or present findings to another forensic serologists for a evaluation and opinion that could or would have rebutted agent Tubergen testimony at trial. In <u>Washington V. Murray</u>, 952 F.2d 1472 (4th Cir.1991), the Court found trial counsel's failure to develope and present to jury the results of exculpatory laboratory test on semen stains found on blanket recovered from bed where rape occurred, which showed that the bodily fluids did not come from defendant, entitled defendant to an evidentiary hearing to resolve an ineffective assistance of counsel claim.. 1/

---

1/ The trial transcripts when copied by JAG, and sent to petitioner did not possess a page number as to agent Tubergens trial testimony , so for the convenient to the Court petitioner is assigning such pages number one through 14 and as exhibit A.

3.

At petitioner's trial agent Tubergen testified to the following: performing chemical testing such as the lattes crust test, and the absorption elution test, and as to the frequencies of the ABO type B and the type PGM 2-1 (Tr.3-9)., that the percentage of the general population is found with type B blood was 10% and the general percentage of population has enzyme PGM 2-1, for a total of 3.6% (Tr.9). Tubergen testified that the test performed on exhibit's 9-14 was definitely blood from a human, that blood could not have been from a dog. (Tr.10) Finally, Tubergen testified that he identified human blood on the cardboard, but grouping test were inconclusive, but he could excluded O and A antigen (Tr.12-14) (Tr.1-14) as exhibit A.

ROBERT C. SHALER, Ph. D. a forensic serologists Consulant was hired by the petitioner after trial to evaluate the serological evidence through petitioner's trial transcripts. See attached as exhibit B. Forensic Serologists Shaler, upon reading the trial transcripts and evaluating the testimony of Roy L. Tubergen, an F.B.I Forensic Serologists found agent Tubergen trial testimony troubling, inconsistent with statistics, and already published medical data. Dr. Shaler, found that the statistics used by agent Tubergen were totally wrong, that Tubergen trial testimony as demonstrated in the trial transcripts showed that Tubergen was either completely unprepared to present testimony about serological evidence or he was not a reliable forensic serologists. Dr. Shaler, whom himself is an expert forensic serologists wrote in his notarized evaluation of serological evidence through the trial transcripts that a "Serologists who is qualified and use to court

4.

testimony should be prepared to give the details of there experimental work and be able to  present the meaning of his work in court.  Dr. Shaler, found that agent Tubergen was unable to do the latter., where at first Tubergen was unable to cite or recognize literature references regarding the frequencies of the ABO type B or the PGM type 2-1. See (Tr.3-5).  Agent Tubergen trial testimony.

Dr. Shaler, in evaluating  agent Tubergen testimony, further found that  Tubergen displayed an ignorance of his profession by quoting statistics taken from a caucasion population instead of the black population which was appropriate in petitioner's trial.  Dr. Shaler also found lack of oversight by Tubergen in which was demonstrated in his lack of knowledge of forensic serology or his indifference to the situation.  Dr. Shaler, also found that  a qualified serologist  should have known that statistics have an ethine  bias, the frequencies of the ABO type B and the PGM type 2-1 can be obtained from the following sources. See exhibit B page 2 of Dr. Shaler DR. Shaler's evaluation of trial testimony and compair agent's Tubergen's trial testimony (Tr.6-10)

Dr. Shaler, found that bloodstains found on the stair treads and on the bloodstains tested on the piece of cardboard using the precipitin test as used by agent Tubergen is subject to error. Since it was known that some of the blood at the scene was dog blood, and that the techniques used by the serologist in identifying the blood at the scene as being human should be examined, Dr. Shaler also found that agent Tubergen's testimony as to the assumpton that blood groups occur only in human blood and since the B antigen wawas found in the blood samples tested, it must be human blood   is false ,where many animals blood give type B when tested. See exhibit B,page

5.

2 , paragraph B, 1,2,3, and compair to agent Tubergen's trial testimony at (Tr.10)., as follows:

Q. In your testing can you say conclusively, with respect to prosecution exhibit 9 through 14 that the blood was from a human as opposed to some other type of animal?

A. It was definitely from a human

Q. Could it have been from a dog?

A. No.

In paragraph C, of exhibit B, Dr. Shaler, continues to evaluate agent Tubergen's trial testimony. Dr. Shaler found agent Tubergen's trial testimony about that he found the B antigen in the bloodstains he tested to be true. Dr. Shaler, also found that agent Tubergen's testimony of the test being inconclusive because Tubergen was unable to perform the complementary test, the lattes crust test to identify the corresponding antibody (Anti-A) found in type B blood as being also true. However, Dr. Shaler, found that the policy of the F.B.I laboratory, as Tubergen testified, determines that simply finding the B antigen alone is an inconclusive result. As such Dr. Shaler, found that agent Tubergen should not have been permitted to testify to either the fact that he found B antigen or to the statistics that it relates to. Dr. Shaler's reason for such a conclusion is that "if the court were to determine that the information be made availible to the court, it should be put in its proper perspective namely, the B found is not necessarily a human characteristic and the frequencies given (3.6:) do not indicate that blood was that of the deceased. See trial transcripts and compair (Tr.12-14).

Dr. Shaler, further states in paragraph D, of exhibit B of his evaluation of the trial testimony that the "unavailability of the original laboratory protocols hindered the ability to access the importance of the blood identified at the scene of the crime, and at the time the test were done, the F.B.I Serology laboratory had the capability to identify genetic markers other than the ABO and PGM reported in petitioner's Brian Garries trial, that the knowledge of attempts to identify these other factors may be important in providing information regarding the age of the bloodstain tested. Dr. Shaler's evaluation of agent Tubergen's trial testimony clearly rebuts the very heart of the governments case in which was built around blood evidence.   Dr. Shaler's rebuts of agent Tubergens trial testimony creates an uncertainty as to the findings and conclusions given by agent Tubergen as to the blood being that of the victim Camille Garries, Dr. Shaler's evaluation of agent's Tubergens testimony raises a doubt as to whether agent Tubergen qualification as being a qualified forensic serologist  expert can be relied on as to performing realiable testing and testifying at trial as to his conclusions, where Dr. Shaler has pointed out that agent Tubergen did display an ignorance of his profession.

Counsel  for  petitioner  at  trial  clearly  denied  petitioner effective assistance of counsel for failure to prepare for trial, because a a reasonable probability had petitioner's trial counsel obtained  the  notes,  laboratory  notes  of  agent  Tubergen,  which explained which test Tubergen had performed, how test were conducted and submitted such to another expert fronsic serologists there is a reasonable probabilityy that such an expert would arrive at same decision of Dr. Shaler, where such expert would have also had the

benefit of evaluating all of agent' Tubern testimony at the 39(a)
session.   Had counsel for petitioner called such a serologists as
a witness at the trial of petitioner and such witness did rebut
agent Tubergen testimony, there is a reasonable probability that
a fairminded jury faced with such conflicting testimony may have
found a reasonable doubt as to petitioner's guilt to prevent a
finding of guilt.   Petitioner's own forensic chemist after finding
that exhibit 8, had blood stains and had not been tested by defense
stated " such should be further tested. (*Tr.279).   Counsel for
petitioner failed to order the testing of exhibit 8 under the
circumstances counsel should have had all blood evidence retested
where petitioner himself stated that blood evidence was not of victim.   Counsel
for petitioner did not prepare for trial which is evident from a
reading of the trial record. and under the circumstances, a
reasonable defense lawyer would have took measures to understand
the laboratory test performed by agent Tubergen and the inferences
that one could logically draw from the results.   At the very least,
any reasonable attorney under the circumstances would have retained
the assistance of a forensic serologists who could have studied the
laboratory reports with sufficient care so that if the prosecution
advanced a theory at trial that was at odds with the serology
evidence, defense would be in a position to expose it on
cross-examination, but this could not have happen because defense
counsel for petitioner did not consult a serologists to test
exhibit 8, or to determine type of blood or to prepare counsel for
trial.

Petitioner was prejudiced by his counsel's failure to order the
testing of blood evidence as to exhibit 8, where petitioner had
nothing to hide or fear if testing was done properly, petitioner

counsel's performance was deficient because the jury was allowed
to retire with the factually inaccurate impression that victims
blood was or could have been present on evidence government
presented,where counsel who could have prepared for trial did not,
where counsel failed to establish that agent's Tubergen's testimony
and testing of serology evidence was suspect and conclusions in
error.  In <u>Driscoll V. Delo</u>, 71 F.3d 701 (8th Cir.1995), the court
found counsel's performance deficient where counsel merely read a
three-page laboratory report, but failed to understand the
serological test performed and to rebut the prosecutor's theory
that conflicted with the report. In <u>Clabourne V. Lewis</u>, 64 F.3d
1373, 1378-85 (9th Cir.1995), the Court found counsel's performance
deficient where counsel consulted expert a few days before expert
testified and failed to provide both expert and the states expert
with defendant's mental health records, In <u>Washington V. Murray</u>, 952
F.2d 1472 (4th Cir.1991), the defendant alleged that his counsel's
conduct at trial had rendered ineffective assistance counsel where
laboratory report 's were available to his counsel that excluded him
as the depositor of the semen  yet his counsel overlooked such
reports that could and did change the out come of his conviction on
appeal;  In <u>Coleman V. Calderon</u>, 150 F.3d 1105 (9th Cir.1998) (same)
The blood evidence in petitioner's case was exculpatory where the
lack of either human blood or the lack of the victims blood on the
relevant items admitted into evidence could have tended to clear him
of his wifes death or weaken the governments theory and created a
reasonable doubt in juries mind to prevent a guilty  verdict.
Counsel's lack of preparedness prejudiced petitioner where his
counsel did not call a forensic serologists on his behalf to present

9.

testimony on the respective test that agent Tubergen had performed , nor did counsel request an expert serologists opinion to uncover the weaknesses in  the government's case, clearly the the failure of counsel to properly cross-examine agent Tubergen was deficient performance where agent Tubergen was never questioned as to whether he used anyother blood identification methods that  might present a false blood type conclusion, counsel's performance was deficient where counsel did not question agent Tubergen as to whether or not he could  have employed another test to establish with certainy the presence or absence of type blood,  counsel's performance was below a standard of reasonableness where on direct or cross examine agent Tubergen was never asked what two blood types he mixed together to end up with a postive    B type blood, where had it been determine that agent Tubergen mixed the wrong blood together  the government's case would have surely been weaken to a point where jury might not have convicted petitioner , counsel for petitioner clearly failed to act as an  advocate for petitioner where counsel did not even come close ro placing the burden on government to prove it's case. Petitioner was prejudiced , because the jury never knew that  agent Tubergen's testiomny was in conflict with already published medical material such as dogs can test postive for the presence of B type blood and counsel for petitioner failure to present such material to jury on cross examination  of agent Tubergen denied  petitioner effective assistance of counsel, where medical material such as "THE PRINCIPLES and PRACTICE OF BLOOD GROUPING, 2nd. Ed.,A, ENSKINE and W. SOCHA, 1978, C.V. MOSBY COMPANY, pg. 61.: WIENER. AS. AMERICAN JOURNAL OF CLINICAL PATHOLOGY, 51, 9, 1969, would have contradicted   agent Tubergen's

belief and testimony that B- type blood could not have belong to the dog that had gotten killed in petitioner's residence and that further testing was required, where it was known to agent Tubergen that a dog had been killed in the area that blood evidence had been collected.   In <u>Strader V. Garrison</u>, 611 F.2d 61,63 (4th Cir.1979), the court found counsel to be ineffective for failure to discover already published material that could have changed the outcome of the proceedings.  Clearly petitioner was prejudiced because the jury was permitted to retire and decide petitioner's faith, without ever learning there was serious problems with agent Tubergen's testimony and medical conclusions of blood, where had jury been made aware of such there may have been enought of a reasonable doubt not to convict petitioner.  Petitioner asked this court to find that he was denied effective assistance of counsel during his trial and remand  this case for an evidentiary hearing where the trial records do not conclusively show petitioner is entitled to no relief, where there is a reasonable doubt as to whether agent Tubergen's performed all test that would conclude blood found on evidence was not dog blood, since dogs also have B-type blood and agent Tubergen did not seem to know this, nor did agent Tubergen testify as to each step in the procedures he performed and where it is clear that agent Tubergen had access to testing equipment with capability to identify <u>**genetice markers**</u> that would have been the proper test to use in this case to determine source of blood, clearly an evidentiary is warranted. <u>Moore V. United States</u>, 432 F.2d 730 (3rd Cir.1970). Petitioner was denied effective assistance of counsel on appellate review for failure of his appellate counsel to raise trial counsel's

ineffectiveness in the trial court on appeal, where there is a reasonable probability that had petitioner's appellate counsel did so petitioner's case on appeal would have been remanded back to the lower court for an evidentiary hearing, but for failure of his appellate counsel to raise trial counsel's ineffectiveness on appeal. U.S. Ex. Rel. Barnard V. Lane, 819 F.2d 798 (7th Cir.1987).

Petitioner pray's this court in the interest of justice to grant him an evidentiary hearing where he was denied effective assistance of counsel.

12.

## ARGUMENT FIVE

WHETHER PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL FOR FAILURE OF HIS APPELLATE COUNSEL TO RAISE TRIAL COUNSEL'S INEFFECTIVENESS ON APPEAL FOR FAILURE TO INVESTIGATE BLOOD EVIDENCE

STANDARD OF Review:

Ineffective assistance of counsel is a mixed question of law and fact de novo Moore V. United States, 432 F.2d 730 (3rd Cir.1970); Osborn V. Shillinger, 861 F.2d 612 (10th Cir.1988)

## ARGUMENT

Petitioner was denied effective assistance of counsel for failure of his appellate counsel to properly research trial transcript's and raise ineffectiveness of trial counsel on appeal for failure of trial counsel to investigate blood evidence that was shipped in blood scattered container. In the instant case petitioner was charged with the murder of his wife Camille Garries, based on the testimony at the Article 39(a) session there is a reasonable probability that victims blood was shipped in same container that other evidence was also shipped in, and that vial of victims blood that broke in container during shipment contaminated all evidence. The government's entire case in chief centered around blood evidence to obtain a conviction of petitioner. At petitioner's Article 39(a) session, F.B.I. agent Tubergen a forensic serology expert testified as a government witness to the following: (*Tr 228)

> Q. Do you recall how many containers the prosecution exhibits we have been discussing, that's 8 through 14,40,23 and 24 arrived at the laboratory?

13.

A. I believe it was two containers.

Q. And prosecution Exhibit 39 for identification, the known blood sample, was that in the same container with the stair treads and the two cardboard pieces, do you remember?

A. No, it wasn't.

However, when Dr. Lawerence Charles Kier, a forensic chemist for the defense testified at the Article 39(a) session his testimony was that all blood evidence came to him in one blood scattered container. See (*Tr.273), as follows:

> Q. Did you want to say something further?
>
> WIT: Ansewr, Only in relation to the exhibits. There was another exhibit that was furnished and that was K2 that was packed in the same box, and I was very concerned about the tube of decedent's blood. And if I had Found blood on these exhibits, I would then have been confronted by the fact that all of those specimens could have been contaminated with the decedent's blood because there was dried residue scattered throughout the whole exhibit.
>
> Q. You received the blood sample as well as all the other exhibits that you examined in one package?
>
> A. Yes, K2 specifically.

The blood was clearly exculpatory evidence of high probative force to petitioner's case where had trial counsel properly investigated why all exhibit's were packed in same container, there could have been probative force to generate enough of a real doubt to agent Tubergen's testimony that evidence had came to him in two containers, and had jury heard such evidence there could have been enough reasonable doubt generated to prevent a guilty verdict, where if it was determined that all blood was packed with exhibits, there is a reasonable probability that blood from broken vail had got on other evidence. There was a total of 40 or more blood items sent to the F.B.I. labortory for testing to determine if victims blood was present.

In testifying agent Tubergen, only stated his belief that items for testing arrived at F.B.I. laboratories in two containers, leaving everyone at the 39(a) session and at trial to accept as true his belief. (*Tr.228). Petitioner's counsel's performance obviously fell below and objective standard of reasonable professional conduct, for failure to investigate whether items' for testing for presence of victims blood was also present in same container as broken vial of victims blood when received at F.B.I., where Dr. Keir, a forensic chemist for petitioner testified that when he received all items for testing, broken vial of victims blood was in same container as well as all other items, and that container had dried blood residue scattered throughout the whole container (*Tr.273) (It should be noted that Dr. Keir, received items for testing after F.B.I, had tested such items) Petitioner's 39(a) session was held months prior to his trial, leaving his counsel time to investigate whether all items for testing had been sent to F.B.I. laboratories in one container for testing, where if such a determination had been made, all items of evidence would have been ruled incompetent evidence and not admitted at petitioners' trial. This is so because all items for testing would have been contaminated by victims blood, where vial of victims blood had broken during shipment to F.B.I. and blood was scattered over the entire inside of the container and it's contents. Since the Elpaso Sheriff Department had sent the items of evidence for testing to the F.B.I. labortarioes for testing to determine the presence of victims blood, and vial of victims blood sent for sampling, it is only logical that petitioner's counsel would have contacted the Elpaso Sheriff Department and asked to be provided with a shipping

15.

and packing list of the items sent for testing to determine if broken vial of victims blood been shipped with other items for testing. Counsel for petitioner should have but did not investigate this critical line of investigation. Petitioner's counsel should have but did not inquire to the El Paso Sheriff Department or any agency as to whether or not had F.B.I. been sent all item evidence and back to them in one blood scattered container. Such a line of inquiry would have been reasonable, where petitioner's own defense forensic chemist testified that broken blood vial and all items of evidence had been sent to him in one blood scattered conatiner.

In <u>Vick V. Lockhart</u>, 952 F.2d 999 (8th Cir.1991)("The Court found that trial counsel's failure to obtain medical reports of alleged rape victim constituted ineffective assistance of counsel). At petitioner's trial counsel for petitioner should have demanded that agent Tubergen, give him a direct answer and support such answer with doucmentation as to how items of evidence came into his custody, and to whether there was one or two containers, and what items of evidence was packed with the broken blood vial of victims blood, counsel should have demanded a shipping and packing list to support agent Tubergen's testimony that items for testing may have come in two different containers.. Had counsel for petitioner obtained a shipping and packing invoice from the El Paso Sheriff's Office, the shipping and packing invoice would have cleared up three questions, (1) whether or not agent Tubergen had testified trueful as to his belief that items of evidence had arrived in two containers, (2) whether or not any items of evidence had been packed in same container with broken vial of victims blood,(3) which items

16.

were packed in same container with broken blood vial that obviously
would have been contaminated by breakage of blood vial.   Counsel
for petitioner could have also used the shipping and packing list
to rebut any statements made by agent Tubergen, that was not
consistent with shipping and packing invoices.   A competent
reasonable trial attorney would have prepared for trial and
investigated and obtained all of the above, where his own defsnse
expert made such known to him.   Such a surprising revelation should
have alerted counsel that critial issues had been uncovered and
needed to be investigated. In United States V. Fisher, 477 F.2d 300
(4th Cir.1973)("The Court found that trial counsel's failure to
investigate and properly prepare for trial amounted to ineffective
assistance of counsel);   In Moore V. United States, 432 F.2d 730
(3rd Cir.1970)(Trial counsel was found to be ineffective for failure
to prepare for trial, an an evidentiary hearing was warranted to
resolve the ineffectiveness of counsel claim ). .  Petitioner was
clearly prejudiced by his counsels' failure to investigate an
important line of defense to resolve said issue, where it is
unlikely all items for testing would have been placed in a single
container or package filled with scattered blood of  someone other
than victims blood after testing, petitioner was prejudiced by his
counsel's failure to investigate and bring issue to the attention
of Court and jury.   In This case the jury was allowed to retire,
with certainly that items of evidence had tested postive for
presence of victims blood, without finding out that broken vial of
victims blood had reasonably been packed with all items of  evidence
, and that broken vial of blood may have been the source for presence
of blood on items of evidence tested by F.B.I. laboratories.

There is a reasonable probability had the jury been made aware of such a possibility that blood of victim had contaminated all evidence, there is a great possibility such information would have altered there finding of guilt of petitioner, but for failure of petitioner's counsel to bring such an argument before the jury, where petitioner's counsel had access to the article 39(a) session transcripts as well as the trial transcripts and had petitioner's appeal counsel raised such a dead bang issue on appeal where he also had access to the article 39(a) session and trial transcripts petitioner would have obtained a remand for an evidentiary hearing to determine if blood evidence had contaminated all evidence but for failure of appellate to raise such an issue on appeal.

WHEREFORE, Petitioner prays this honorable court to remand this cause back for an evidentiary hearing where the records show that he is entitled to such to resolve the issue of ineffectiveness of trial and appellate counsel.


## CONCLUSION

Based on the foregoing argument's and case citations petitioner prays this court to grant the relief prayed for in the interest of justice.


I declare the foregoing to be true and correct pursuant to 28 U.S.C. 1746.

18.

EXHIBIT   A




EXHIBIT   A




EXHIBIT   A




EXHIBIT   A

ROY L. TUBERGEN

      called as a witness for the prosecution, was sworn,
and testified as follows:

DIRECT EXAMINATION

Questions by assistant trial counsel (Ely):

Q:        State your name for the record.

A:        My name is Roy L. Tubergen.

Q:        What is your occupation?

A:        I'm a Special Agent with the FBI currently assigned
to the FBI Laboratory in Washington, D.C.

Q:        How long have you been with the FBI?

A:        Approximately 11 years.

Q:        How long have you been assigned to the FBI Laboratory?

A:        Almost four and a half years.

Q:        In what capacity are you assigned there?

A:        I'm a serologist in the serology unit.

Q:        What is the nature of your work?

A:        I examine physical evidence in criminal cases for
blood and other body fluids.

Q:        What percentage of your time is devoted to these types
of examinations?

A:        All my time.

Q:        Would you please state your educational background?

A:        I have a Bachelor of Science Degree from Michigan
State University and six hours of graduate credit
in Forensic Serology from the University of Virginia.

Q:        What is your Bachelor's Degree in?

A:        In Zoology.

Q:        Have you had any specialized training in serology
since you've joined the FBI?

A:        Yes, I have.  For approximately one year, I was under
the supervision of other qualified examiners in my
unit until they felt that I was ready to work cases
on my own.

Q:          And about how many cases do you examine annually?

A:          About 250 to 275 cases.

Q:          How many individual examinations would be encompassed
            by that figure?

A:          That would represent thousands.

ATC(ELY):   Your Honor, the Government offers Special Agent
            Tubergen as an expert in forensic serology at this
            time.

MJ:         You may proceed.

ATC(ELY):   Thank you.  Mr. Tubergen, could you describe for the
            court the procedures used to identify a question of
            blood stain?

WIT:        The simplest way to put it--take an example, an item
            of evidence, what I would do initially was visually
            examine the item of evidence, look for stains that
            possibly could be blood--reddish colored stains, brown-
            ish colored stains, that sort of thing.  Then what I'd
            do is conduct a preliminary screening test.  This pre-
            liminary screening test is known as a phenolphthalein
            test where I would take a damp swab and rub it across
            the stain to extract some of the stain onto the swab.
            Then I would add a couple chemical reagents, one of
            them is phenolphthalein and the other is hydrogen
            peroxide.  If I get a color change, a pinkish color,
            it's an indication that it could be blood.

Q:          Sir, is that test in itself conclusive for the presence
            of blood?

A:          No, it's not; it's just a screening test for the
            presence of blood.

Q:          What is the next test that you employ?

A:          The next test is a confirmatory test known as a hemo-
            chromogen test where I'd go back to the item of evidence
            and take a cutting or a scraping from the questioned
            stain, place it on a microscope slide, add a cover
            slip to it and another chemical reagent to it, and
            examine it under the microscope.  This is a micro-
            chemical test and what I'm looking for is the
            presence of crystals.  This is a confirmatory test
            for blood.

Q:          Does that test indicate what type of animal or person
            the blood comes from?

A:          No, it doesn't.  That test just tells me that I'm
            dealing with blood.  So, then I move on to another
            test where I go back to my stain again and take
            another cutting or scraping from that stain, place

TUBERGEN--DIRECT

A:        it in a small test tube, add a saline solution to
it to allow it to bleed out into the saline solution,
and then I add an antihuman serum to it. And if
a precipitant line forms in the test tube, I know
that I definitely do have human blood.

Q:        Can you go on to determine, for example, different
types of human blood?

A:        Yes, if the quantity is sufficient to go further than
that, what I would do is go back to the stain again
and conduct a grouping test to try to characterize
the blood stain into the ABO blood group system.

Q:        What kind of test is that?

A:        There's two tests that we run. One is known as the
Absorption Elution Test and the other is known as
the Lattes Crust Test. The Absorption Elution Test
is to identify the antigen, and the Lattes Crust
Test is to identify antibodies in blood.

Q:        Do these tests duplicate each other in determining
the type of blood?

A:        As I said, what we're trying to do is identify an
antigen, and in the other test we're trying to
identify an antibody. Both of these tests have to
concur. They have to be in agreement before I'd
make a positive identification. Otherwise, I'd
call my result inconclusive.

Q:        What are the relative sensitivities of the two tests,
one to the other?

A:        The Absorption Elution Test is much more sensitive
than the Lattes Crust Test.

Q:        What does that mean in terms of the amount of scraping
or the amount of the stain you need to make a call
with respect to each test?

A:        Since the Absorption Elution Test is more sensitive,
my chances of getting a positive result would be
greater in that test than it would with the Lattes
Crust Test with a small quantity of blood.

Q:        Is there anything else in blood, any other factors
that you can identify--are there any other physical
particles of blood that you can identify?

A:        There are other ways to characterize a blood stain.
There are what is known as enzymes in the blood that
we can identify forensically to identify, break down
or characterize the blood stain even further than the
ABO blood group system.

Q:        And what type of test do you do for the presence of enz

A:        That's the technique known as electrophoresis.

TUBERGEN--DIRECT

Q:     Are these tests recognized in the scientific community, the ones you've just described?

A:     Yes, sir.

Q:     Let me show you Prosecution Exhibit 39 and ask if you can identify it.  (WIT was shown this exhibit.)

A:     This is a known blood sample which was described to me as coming from the victim in this case, which I had the opportunity to characterize at the FBI Laboratory.

Q:     I notice in that sample there appears to be a broken glass vial and some stains.  In what condition did that exhibit come into your possession?

A:     The blood sample was broken when I received it at the FBI Laboratory.

Q:     Were you able to test it in the condition in which it arrived?

A:     Yes, I was, due to the fact that most of our work is done on dried blood stains anyway.

Q:     How did you test this exhibit?

A:     In the manner that I described a few minutes ago.  I conducted the Absorption Elution Test and the Lattes Crust Test, and then attempted to conduct an electro-phoresis test on the blood sample.

Q:     What was the result with respect to the victim's blood?

A:     I was able to identify that the victim belonged to blood group B, and I also was able to identify the enzyme PGM 2-1.

Q:     Let me show you Prosecution Exhibit 8 and ask if you can identify that.  (WIT was shown this exhibit.)

A:     Yes, this is what was described as a stair tread which bears my marks.

Q:     If you would please can you come down and examine Prosecution Exhibits 9 through 14 and see if you can identify them for the court.

     (WIT stepped out of the witness stand and went to a table where these exhibits were displayed.  He then examined each exhibit.)

A:     Yes, these are also stair treads which I examined at the FBI Laboratory.

TUBERGEN--DIRECT

(WIT then resumed his seat in the witness stand.)

Q:    Did you test Prosecution Exhibits 8 through 14?

A:    Yes, I did.

Q:    How did you test them?

A:    In the manner that I described earlier.  I conducted a visual examination, then preliminary screening tests, then went on to a confirmatory test where I was able to definitely say that it was blood, and then I conducted origin tests where I could say that it definitely was human blood.  If it was so possible I went on to conduct grouping tests on some of the treads.

Q:    With respect to Prosecution Exhibit 8.  What result did you get in your testing?

A:    On Exhibit 8, I was able to identify human blood but my grouping tests were inconclusive.

Q:    You say they were inconclusive.  What were the results of each of the two tests?  Would you describe those to the court?

A:    The first test, the Absorption Elution Test, I was able to detect the presence of the B antigen and the H antigen.

Q:    Were you able to get a result on the Lattes Crust Test?

A:    On the Crust Test I was not able to detect any antibody at all.

Q:    You said you called that inconclusive.  Are there other ways to obtain a reading that you would determine to be inconclusive?

A:    On this particular case, my result was inconclusive because I was not able to detect an antibody; therefore, I made a call, I'd be basing my result just on one test and we don't do that.  We try to have two tests where both our results concur, which we call a positive result.  In this particular case, with the Lattes Crust Test, I was not able to detect any antibody.  There are some cases where I may detect an antibody.  Let's say, my Absorption Elution Test would indicate a B, my Lattes Crust Test would indicate an A, and based on that I would call it inconclusive.

Q:    I believe you said you found B and H antigens on Prosecution Exhibit 8?

A:    That's right.

TUBERGEN--DIRECT

Q:    Could you, as a result of the presence of the B and H antigens, rule out any blood group in the ABO blood grouping system?

A:    Yes, I could rule out a A individual.

Q:    Could you rule out an AB individual?

A:    There's a chance it could possibly have come from an AB individual.  The fact that I did not detect an A in the antigen test, it may have been there at one time but I just was unable to detect it.

Q:    How likely is it that you would detect the B and H antigens and not the A antigen in a person who had AB blood?

A:    In a person with AB blood, I would think it would be pretty remote.  All individuals have H antigen, however, it's in small quantities in an AB individual.  In this particular case, I picked up the H antigen and if it came from an A individual, I would think that I would pick up the--or an AB individual, I'd pick up the A before I'd pick that H antigen, which is in small amounts in an AB individual.

Q:    Now, with respect to a person with an O blood type, could the blood that has a B antigen in it come from a person with an O blood type?

A:    Can you repeat the question please?

Q:    Can you rule out type O blood when you find a B antigen?

A:    B antigen alone?

Q:    B and an H antigen.

A:    Well, O individuals have what is known as H antigen, so if I detect B and H antigens there's a chance there could be a mixture of both, the B and O individual because I have the presence of the B and H antigens.

Q:    Can you identify where you took the samples you tested from Prosecution Exhibit 8?

A:    On Prosecution Exhibit 8, you can see, or maybe not see, where I marked 1b on here and I have an arrow there (indicating).  What I did was I took a scraping from here and a scraping from here (indicating) on this item.

Q:    Would you circle the areas that you scraped on Prosecution Exhibit 8 with that marker please?

(WIT complied.)

TUBERGEN--DIRECT

Q:      When you were dealing with Prosecution Exhibits 8
        through 14, were you dealing with very small amounts 3
        of blood?

A:      That's right.

Q:      Indeed, it was almost pinhead size amounts?

A:      Some of them are.

Q:      Let's take Prosecution Exhibit 8 for example.  Would
        you tell us how you took the specimens or the blood
        that you identified off of Prosecution Exhibit 8?
        Just describe to the jury the process for taking off
        of 8.

A:      Since it's a hard surface, the best way of getting
        the blood off that hard surface is to scrape it.

Q:      Did you just scrape one little dot off, or did you
        scrape more than one dot off?

A:      No, as I showed the jury, I scraped two areas.

Q:      And you scraped the dots in those two areas together,
        is that correct?

A:      Right.

Q:      So, can we refer to that as composite scraping?

A:      That's the correct term.

Q:      In any of the exhibits, Prosecution Exhibits 8 through
        14, did you by chance scrape, let us say, what appeared
        to be suspect blood from one exhibit together with
        suspect blood from another exhibit?

A:      As I recall, no.

Q:      As you recall.  Would you do that?

A:      Can you hand me one of the items?

Q:      I will hand you Prosecution Exhibit 8.  Now, the
        question is, in case you just misunderstood, would
        you have scraped specimens off of Prosecution 9 to-
        gether with Prosecution Exhibit 8?

A:      Oh, no, not at all.

Q:      Why don't you do that?

A:      We look at each item of evidence individually when
        it comes into the laboratory.  I don't most times know
        where the item of evidence came from.  It could come
        from one room, it could come from another room, and
        we try to dissociate them.  We conduct an examination
        on one particular item of evidence, put that evidence
        away, and then conduct it on another item of evidence.

Q:      Could one of the reasons be that if you scraped specimen
        from two different pieces of evidence together, you coul

A:        That's a possibility.

Q:        That's one of the reasons you don't do that, is that correct?

A:        That's right.

Q:        Also, you could be scraping specimens that were put in a location at different times together, is that correct?

A:        That's right.

Q:        And that's another reason you don't do that, is that correct?

A:        That's right.  There's no way I can put a time limit on a particular blood stain.

Q:        Now, you went through just very briefly with us, but just to make sure we all understand, did you indicate that you took one piece of evidence--let us say, Prosecution Exhibit 8--and you did the scraping and the full testing on that piece of evidence before you went to the next one, is that correct?

A:        That's correct.

Q:        And then you put that one away, you put Prosecution Exhibit 9 on the desk or table, and went through the same procedure with that, is that correct?

A:        That's right.

Q:        During the period of time that you were doing the testing on Prosecution Exhibits 8 through 14 did you not try to take enough so you could at least go through the ABO testing, at least from your experience?

A:        I try to take it as far as I can.

Q:        No, I'm talking about taking enough specimen.  Didn't you try to take enough specimen so that when you finished with that specimen, Prosecution Exhibit 8, that it looked to you like you could conceivably go through the ABO testing with that amount?

A:        Based on my experience, I can look at a stain on an item, and just based on looking at that stain I can usually tell if there's enough there even before I start scraping it, if you know I can characterize a blood stain.

Q:        So, for example, did you do that on each one of these items?

A:        That's right.

TUBERGEN--CROSS

Q:          What were your results?

A:          I was able to identify Group B human blood and the
            enzyme PGM 2-1.

Q:          Sir, do you know the percentage of general population
            in which blood group B is found?

A:          In the general population...

DC:         Objection, this witness is qualified as a serologist,
            not a statistician.

MJ:         Is this a different objection?

DC:         Same objection.

MJ:         Overruled.

ATC(ELY):   Let me ask you again, sir, do you know what percentage
            of the general population blood type B is found in?

WIT:        In the general population, it's about 10 percent of
            the population.

Q:          Do you know what percentage of the general population
            has the enzyme PGM 2-1?

A:          In the general population, it's about 36 percent.

Q:          Are the enzymes genetically dependent or independent
            of the blood grouping?

A:          The enzymes are independent of the blood grouping.

Q:          Does that mean they are linked or not linked in any
            way?

A:          They're not linked to each other.

Q:          Would it be fair to say that approximately 3.6 percentage
            of the population has the combination of B PGM 2-1?

A:          That's correct.

Q:          With respect to Prosecution Exhibits 9 through 14,
            there are black arrows that mark the exhibits in
            various locations, and number 1b is occasionally
            found on the facings of the treads.  What do those
            denote, do you know?

A:          The area where I've marked 1b is where I've taken
            my scraping.  Other areas where I have arrows indicate
            that I was able to identify a preliminary screening
            test; in other words, I had a positive phenolphthalein
            in that area.

TUBERGEN--DIRECT

Q:        Thank you.  Would you show that to the court?  (WIT stepped out of the witness stand to display this exhibit to the court members.)

A:        The areas that I've circled were the areas that I took the scrapings to conduct my examinations.  (WIT resumed his seat in the witness stand.)

MJ:      I would point out that I did see one puzzled look from a court member and, of course, I'd remind you again that after we've had complete direct and cross-examination you may ask this witness any questions you want; and if you'd like him to explain a particular process again, because I know he's going very quickly, feel free to do that.

You may proceed, trial counsel.

ATC(ELY)  Thank you, Your Honor.

Now, you've said it's possible if you detect the presence of B and the O antigens that it may the result of a mixture of blood.  Have you had occasion to examine or determine blood stains in cases where there were mixtures of two different individuals' blood?

WIT:     Yes, I have.

Q:        Do you have any opinion as to the probability of a mixture of blood from two people, based on your experience, that would be found in areas the size which you have circled on Prosecution Exhibit 8?

A:        In most cases where I've dealt with more than one person bleeding, the quantity of blood was much greater than what I had to work with here.

Q:        You've had an opportunity to examine Prosecution Exhibits 9 through 14.  What results, if any, did you obtain from your testing on those exhibits?

A:        On all those exhibits I was able to identify human blood.

Q:        In your testing can you say conclusively, with respect to Prosecution Exhibits 9 through 14, that the blood was from a human as opposed to some other type of animal?

A:        It was definitely from a human.

Q:        Could it have been from a dog?

A:        No.

TUBERGEN--DIRECT

Q:      Let me show you Prosecution Exhibit 40 and ask you
        to identify that.  (WIT was handed this exhibit.)

A:      This is a trunk latch, which again I examined at the
        FBI Laboratory.

Q:      You examined that in conformity with the tests you've
        described?

A:      That's right.

Q:      What were your results?

A:      I identified human blood; however, the quantity was
        insufficient for me to do any further examinations
        on this item.

Q:      What was the condition of the stains that you noticed
        on that item?

A:      Very small.

Q:      Let me show you what has been marked as Defense
        Exhibit B and ask you if you can identify that?
        (WIT was handed this exhibit.)

A:      This is a mop that I examined at the FBI Lab.

Q:      What were the results of your examination with respect
        to this mop?

A:      My results were negative.

Q:      Let me ask you, is it possible to obliterate the
        presence of blood stains, to do something to a blood
        stain to make it impossible to detect under laboratory
        conditions?

A:      Yes, it would be fairly easy for some individual to
        take a blood stain and wash it.  Let's say, if you
        had a blood stain on your shirt, you could completely
        wash the stain out of the shirt where I would not be
        able to conduct any examinations on that stain.

Q:      Now, sir, hypothetically, if you had fresh blood on
        Defense Exhibit B, do you have an opinion as to how
        easily it could be removed so that it would not
        respond to the testing procedures you've described?

A:      If there was blood on this particular item of evidence,
        and someone wanted to remove the stain, they could
        very easily do it by dunking it in a bucket of water,
        let it soak in a bucket of water, or that sort of thing
        and then let it dry out.

TUBERGEN--DIRECT

Q:      Do you have an opinion as to the effect of repeated
        rinsing on an item with blood on it, such as Defense
        Exhibit B?

A:      Here again, if an individual wanted to remove a blood
        stain, they could do it very easily where I wouldn't
        be able to conduct any examinations.

Q:      Let me show you Defense Exhibit A for Identification
        and ask you if you had any opportunity to conduct
        any testing on that.  (WIT was shown this exhibit.)

A:      Yes, this is the floor mat which I examined at the
        FBI Lab.

Q:      Did you find any blood, or what were your results
        with respect to your testing on that exhibit?

A:      On the floor mat my results were negative.

Q:      Let me ask you to examine Prosecution Exhibit 23 for
        Identification.  (WIT was handed this exhibit.)
        Have you seen that exhibit before?

A:      Yes, I have.

Q:      And what is that, sir?

A:      It was described to me as a piece of cardboard which
        was sent to the FBI Lab and I examined it.

Q:      In accordance with the tests you've described?

A:      That's right.

Q:      What results, if any, did you obtain on that?

A:      I was able to identify human blood on this piece of
        cardboard but my grouping tests were inconclusive.

Q:      By inconclusive, what were the results of the Absorption
        Elution and the Lattes Crust on that exhibit?

A:      Here again, as I mentioned earlier, there are two
        standard tests that we run.  Both of them have to
        concur before we'd make a positive call.  On the
        Absorption Elution Test, the test for the antigen,
        I was able to identify the B antigen.  However, on
        the Lattes Crust Test, the test for the antibody,
        I was not able to identify any antibody at all.

Q:      Did you identify the H antigen with respect to this
        exhibit?

A:      No, on this exhibit I did not pick up the presence
        of the H antigen.

TUBERGEN--DIRECT

Q:      Again, on the basis of that, what blood type can you exclude as being on that exhibit?

A:      I could exclude A--no, I could exclude O.

Q:      You said you had a B antigen, so could you exclude any other types?

A:      Yes, I could exclude A.

Q:      With respect to this exhibit, could that blood be the result of an AB individual?

A:      Yes, it could.

Q:      Let me ask you to look at Prosecution Exhibit 24 for Identification. I'll ask if you've seen that exhibit before. (WIT was shown this exhibit.)

A:      Yes, this was described as a piece of cardboard which I again examined at the FBI Laboratory.

Q:      Mr. Tubergen, I noticed that exhibit is in three pieces. Had it fallen into three pieces when you examined it?

A:      When I examined it, it was all one piece.

Q:      Specifically, the small black-colored on one side, rectangular piece, do you recall was that attached to the large black cardboard?

A:      Yes, it was.

Q:      Do you know about where that was attached?

A:      It was attached approximately like this on the top edge with the longer piece of cardboard (indicating).

Q:      The record should reflect that the witness is indicating the upper lefthand side of the large black cardboard. Mr. Tubergen, for purposes of the record, let me ask you...

MJ:     Do you agree with that, defense counsel?

DC:     Yes, sir.

ATC(ELY): Let me ask you to mark using a red line the area that the small piece of black cardboard was attached to the larger one, if you would please, on the larger piece of cardboard. Just make a long red mark there. (WIT complied.) Thank you, sir. Did you conduct any testing on that exhibit?

WIT:    Yes, I did.

Q:          What were your results again with respect to
            Prosecution Exhibit 9 through 14?

A:          I was able to identify human blood on all those
            items.

Q:          On each one of them?

A:          That's right.

ATC(ELY):   No further questions, Your Honor.

MJ:         Defense counsel?

                    CROSS-EXAMINATION

Questions by defense counsel:

Q:          Mr. Tubergen, I gather from your testimony then
            that you cannot make a determination that a certain
            kind of blood, or blood specimen comes from a certain
            person, is that correct?

A:          The only thing I can do, if I'm given a known blood
            sample--for example, a known blood sample belongs
            to an individual from group B, and I identify group B
            on a questioned item, I can say that those two items
            are consistent with each other.

Q:          That's as far as you can go?

A:          That's correct.

Q:          Now, you can, however, eliminate people from a blood
            group or from a specimen, is that correct?

A:          That's correct.

Q:          Which means if you determine certain characteristics
            of blood you can identify a person if you know that
            kind of blood, and say that person does not belong
            to the group this blood came from, is that correct?

A:          A known sample maybe let's say group B again, and
            I identify group A on a questioned sample, there's
            no way they could be associated.

Q:          Now, the first test you said you do is a visual
            test, is that correct?

A:          That's correct.

Q:          Now, you have a trained eye to actually look for
            this blood, is that correct?

A:          That's correct.

TUBERGEN--DIRECT/CROSS

EXHIBIT  B

EXHIBIT  B

EXHIBIT  B

EXHIBIT  B

ROBERT C. SHALER, Ph.D.
Forensic Consultant
30 Spring Street
Flemington, N.J. 08822

AUG 1 0 REC'D

Richard M. Borchers
Attorney at Law
2907 Zenobra Street
Westminster, Colorado 80030

Dear Mr. Borchers,

        I have reviewed the documents given to me by Dr. Garries regarding the
serological testimony given by Mr. Tubergen, a serologist with the F.B.I. at
that time.  In addition I have reviewed the autopsy report, the  police reports
and the scene pictures.

        In studying the information given to me, I am concerned about the lack of
documentation of the serological findings.  The F.B.I. original records
concerning the testing done were not provided for my evaluation.  It is
important that these documents be made available because the results obtained as
testified to by Mr. Tubergen must be taken for granted.  It is my experience
that a great deal of information can be obtained from studying the original
laboratory protocols.  I would appreciated if you could obtain them for me to
study.  In addition the crime scene pictures are incomplete.  It is difficult to
evaluate the blood stain spatter patterns when all the patterns are not
available, at least preserved on photographs, to study.  With the above in mind,
I will present my evaluation of the evidence.

I.  EVALUATION OF SEROLOGICAL EVIDENCE THROUGH THE TRIAL TRANSCRIPTS

        A.  Statistics used by the F.B.I. serologist.

        The statistics used by the F.B.I. serologist were wrong.  His
testimony at trial as demonstrated in the transcripts showed that he was either
completely unprepared to present testimony about serological evidence or he is
not a reliable forensic serologist.  Serologists who are qualified and used to
court testimony should be prepared to give the details of their experimental
work and be able to present the meaning of this work to the court.  Mr. Tubergen
was unable to do the latter.  At first he was unable to cite recognized
literature references regarding the frequencies of the ABO type B or the PGM
type 2-1.  When he finally did obtain references he displayed an ignorance of
his profession by quoting statistics taken from a caucasion population instead
of the black population which was appropriate in the Brian Garries trial.  This
oversight demonstrates his lack of knowledge of forensic serology or his
indifference to the situation.  A qualified serologist should know that these

statistics have an ethnic bias. The frequencies of the ABO type B and the PGM type 2-1 can be obtained from the following sources:

### For ABO type B Frequencies

(1). The Principles and Practice of Blood Grouping, 2nd. Ed., A. Erskine and W. Socha, 1978, C.V. Mosby Company, pg. 61.

(2). Wiener, A.S. American Journal of Clinical Pathology, 51, 9, 1969.

### For PGM type 2-1 Frequencies

(1). The B.W. Grunbaum reference used by Mr. Tubergen is sufficient for this information except that the frequencies for the black population should be used. He used statistics for the caucasian population.

The statistics in these publications show that the blood type B has a frequency in blacks of aproximately 22-23 percent, not the 10 percent indicated by Mr. Tubergen. The PGM statistics as shown in Grunbaum's article indicate that the frequency of PGM type 2-1 in blacks is aproximately 31 percent, not the 35 percent testified to at trial.

The relevance of the above is shown in the overall percentage frequency that blood like that found at the crime seen occurs in the population of blacks.

```
ABO type B..................23 %
PGM type 2-1................31%
     TOTAL FREQUENCY........7.1%
```

Although the frequency is still small, it is not the 3.6 % indicated at the trial, and is actually almost twice the value testified to. This means that instead of almost four or one out of 25 having blood like that, the figure aproaches one of ten.

The relevance of this percentage can be understood in terms of the statistics used in paternity investigations. In these latter calculations, a probability of paternity of at least 98 % is necessary to utilize terminology such as "very likely" that the man is the father. In this instance, we have a figure that says that aproximately 93 % of the population could not have blood like that found at the house and that it matches the blood of the deceased in the two categories (out of many) that results were obtained. In paternity calcuations, 93 % is simply not good enough to determine that a particular person was the father of a child. In this situation the 93 % is not a probability figure, simply a number of people in the black population who could not have the same blood as the deceased.

B.  Species Identification of Suspect Bloodstains

The identification of the bloodstains on the stair treads and on the bloodstains tested on the piece of cardboard using the precipitin test described at the trial is subject to error. Since it is known that some of the blood at the scene was dog blood, the techniques used by the serologist in identifying

the blood at the scene as being human should be examined.

1. First is the problem with the testing sera used to differentiate the blood of one species from another. It is well known that most commercial anti-species sera used to make this determination is non-specific if it is not used in the proper way. It must be tested against known blood of different species to determine the proper dilution necessary to differentiate human blood from other animal blood.

2. Second the assumption that blood groups occur only in human blood and since the B antigen was found in the blood samples tested, it must be human blood is false. Blood groups, as tested by blood banks and in forensic laboratories — especially the latter who routinely use the absorption elution test (as in this case), are fairly ubiquitious in nature. They are not the sole domain of the human species. Many animal bloods give type B when tested. Bacteria will also give blood group tests, and group B is particularly significant in this regard.

3. Third, the simple finding of a PGM type from the bloodstains tested does not, by itself, make this a human bloodstain. In fact most animal bloods have a PGM type and some will give patterns which can be confused with those normally given by humans.

C. Relevance of Finding of B Antigen in the Bloodstains Tested

The serologist testified at the trial that he found the B antigen in the bloodstains he tested. He also indicated that this was an inconclusive result because he was unable to perform the complementary test, the Lattes Crust test to identify the corresponding antibody (Anti-A) found in type B blood.
He was correct in this. The policy of the F.B.I. laboratory, as he testified, determines that simply finding the B antigen alone is an inconclusive result. As such he should not have been permitted to testify to either the fact that he found the B antigen or to the statistics that it relates to. If the court were to demand that the information be made available to the court, it should be put in its proper perspective. Namely, the B found is not necessarily a human characteristic and the frequencies given (3.6 %) do not indicate that the blood was that of the deceased.

D. Work Not Testified to at Trial

The unavailability of the original laboratory protocols hinder the ability to access the importance of the blood identified at the scene of the crime. At the time the tests were done, the F.B.I. serology laboratory had the capability to identify genetic markers other than the ABO and PGM reported in the Brian Garries trial. The knowledge of attempts to identify these other factors may be important in providing information regarding the age of the bloodstain tested. The ABO and PGM factors are particulary stable in dried blood while other factors — EsD, EAP and GlO I — are not. If these other factors were attempted by Mr. Tubergen and these attempts were unsuccessful, the age of the stain could be have been deposited beteen 30 and 180 days before the

tests were done. however, if the EsD, EAP or GLO I genetic markers had been deposited, the stains were most likely deposited within 60 days prior to the time the analyses were conducted.

E.  Questions Posed by Dr. Garries

1.  Concerning the PGM enzyme

a.  After blood leaves the body and dries, the enzymes stabilize. Each enzyme will deteriorate at its own rate until its activity is gone.  PGM has been determined to survive in the dried state for up to six months.  The actual time a particular case sample will remain active will depend on the temperature and humidity of its environment.

b.  Pregnancy will not produce a false postive PGM result.

c.  We have successfully identified the PGM type of individuals who have been dead for several days.

d.  The broken vial probably did not contaminate the blood.  The dried blood in the package was probably better preserved than the liquid material in the vial.

2.  Concerning Fingernail Clippings

a.  Sometimes the victim will have foreign material which can be found under the fingernails.  If the material is skin or blood, it can be grouped acording to its ABO type and acording to its isoenzyme types, the most common isoenzymens tested are PGM, GlO I, ADA and AK.

3.  Concerning the Absence of a Toxicology Report

a.  The identification of drugs in the body of the deceased is a common practice in Medical Examiner's Offices throughout the United States.  In questioned death investigations it should be mandatory.

Should you have any questions regarding my report, do not hesitate to contact me.

Respectfully submitted,

Robert C. Shaler

Robert C. Shaler, Ph.D.
Forensic Consultant
7/30/84

State of New York  } ss.:
County of New York }

Sworn to before me this
2 day of Aug..... 19 84

Jeffrey A. Wolfson

JEFFREY A. WOLFSON
Notary Public, State of New York
No. 31-1031447

## CERTIFICATE OF SERVICE

I , do hereby certify that a true and correct copy of petitioner's motion to supplement and supplemental brief has been mailed to: United States Attorney
SHELLEY L. GRANT
P.O. BOX 11754
HARRISBURG, PENNSYLVANIA 17108-1754

by pre-paid mail on this the 23 , day of August, 2001

Certified Return Receipt Requested 7000 0600 0024 9386 8566

*Phanor J. Mk AKA*
*Bi RBa*

*23 Aug 2001*

19.

TO: Cleak of Court

23 Aug 2001

**RECEIVED**

From: Pharaoh O. Mkosi
AKA Brian K. Garries
Civil no: 1:cv-01-1119

AUG 27 2001

MARY E. D'ANDREA, CLERK

Subject: Notice change of Address to
Pharaoh O. Mkosi # 11388-045
USP Pollock
P.O. Box 2099
Pollock, LA 71467-2099

Dear: Sir/Maam

I Am informing the Court of my new Address
Listed Above, this was a unvolutary/nondisciplinary
moved iniated by USP Lewisburg PA to USP Pollock
LA to make room for incoming inmates from
other regions. Please find enclose A Motion to
Supplement Pleadings with Certificate of
Service Attached mailed to U.S. Attorney. Please
send All Legal Correspondence to the new Address
Listed Above.

thank you

Pharaoh O. Mkosi AKA
Brian K. Garries

Pharaoh O. Nkosi #13685-045
United States Penitentiary, Pollock
P O Box 2099
Pollock, LA 71467

PLACE STICKER AT TOP OF ENVELOPE
TO THE RIGHT OF RETURN ADDRESS.
FOLD AT DOTTED LINE

## CERTIFIED MAIL



7000 0600 0024 9386 8566

ATTN: Clerk of
UNITED STATES D
U S COURTHOUSE
228 WALNUT STRE
P O BOX 983
HARRISBURG PA 1



RICT COURT

08

FILED
HARRISBURG


