ORIGINAL

MCC:MEH:slg:2001V00694

FILED
HARRISBURG, PA

SEP 05 2001

MARY E. D'ANDREA, CLERK
Per ______ Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN K. GARRIES, a/k/a, Pharaoh O. Nkosi, Petitioner | : | |
| v. | : | Civil No. 1:CV-01-1119 (Kane, J.) |
| DONALD ROMINE, Warden, Respondent | : | |

GOVERNMENT'S RESPONSE TO
THE PETITION FOR WRIT OF HABEAS CORPUS

This is a habeas corpus matter brought under 28 U.S.C. §2241, by a federal prisoner, Brian K. Garries, formerly confined at the United States Penitentiary Lewisburg (USP Lewisburg), Lewisburg, Pennsylvania.[1] Garries names Warden Donald Romine as the sole respondent. By order dated July 18, 2001, this Court issued a rule to show cause directing the respondent to address the allegations of the habeas corpus petition within twenty (20) days.

On August 23, 2001, this Court granted respondent's motion for an enlargement of time in which to submit his response. On August 23, 2001, Garries filed a motion to supplement his habeas petition and a supplemental brief.

---

[1] By letter dated August 9, 2001, Garries informed the undersigned that he was transferred to the United States Penitentiary Pollack, Pollock, Louisiana.

In his petition, Garries argues ineffective assistance of counsel during the appeals of his 1983 general court-martial for the murder of his wife. As explained below, Garries claims presented to the appropriate military tribunals were given full and fair consideration, therefore, his habeas petition should be dismissed.

**Statement of the Case**

Garries is currently serving a mandatory life sentence for premeditated murder. The facts surrounding Garries conviction, as well as the issues addressed by the appellate courts, may be found in United States v. Garries, 19 M.J. 845 (A.F.C.M.R. 1985)(attached); United States v. Garries, 22 M.J. 288 (C.M.A. 1986), cert. denied, 479 U.S. 985 (1986)(attached); Nkosi v. Lowe, No. 94-03, 1994 WL 175766 (A.F.C.M.R. 1994)(attached); and Nkosi v. Lowe, 40 M.J. 266 (1994)(table)(attached). The following summary of facts pertaining to the court-martial conviction are drawn from these published decisions, Garries' petition and attachments.

In 1983, Garries was convicted by general court-martial convened at the United States Air Force Academy in Colorado Springs, Colorado of the murder of his wife. Garries was sentenced to life imprisonment. Habeas Petition at 2.

Garries filed an appeal with the Air Force Court of Military Review (A.F.C.M.R.) claiming that he had been denied

effective assistance of counsel.[2] Specifically, the claims were; 1) that trial defense counsel's pretrial preparation was totally inadequate; 2) that trial defense counsel's cross-examination was inadequate; 3) counsel failed to call certain witnesses who could have provided exculpatory evidence; and 4) that trial defense counsel was deficient in ferreting out evidence. See Garries, 19 M.J. at 863. The A.F.C.M.R., after carefully reviewing the issues, concluded that Garries' ineffective assistance of counsel argument was without merit. Id. at 865. On January 16, 1985, the A.F.C.M.R. affirmed the conviction and sentence. Id. at 869. A subsequent appeal to the United States Court of Military Appeals (C.M.A.) was affirmed on August 4, 1986. See United States v. Garries, 22 M.J. 288 (C.M.A. 1986), cert. denied 479 U.S. 985 (1986).

In 1994, Garries filed a petition with the A.F.C.M.R. for "Extraordinary Relief in the Nature of Error Coram Nobis" arguing that his appellate counsel violated his right to effective assistance of counsel. See Nkosi, No. 94-03, 1994 WL 175766 *1. Garries claimed that his appellate counsel "provided ineffective assistance of counsel when they moved to file certain affidavits and documents in support of his petition for a new trial which . . . 'create[d] a cloud of guilt and cuplability' that tended to

---

[2] In addition to ineffective assistance of counsel Garries presented ten other claims of error in his appeal. See Garries, 18 M.J. 845 (A.F.C.M.R. 1985).

prove the prosecution's case against him." Id. Garries also claimed that his appellate counsel for his appeal with the C.M.A. were ineffective because they did not assert that his first appellate counsel was ineffective. Id. On April 29, 1994, the A.F.C.M.R. denied Garries petition for extraordinary relief finding that his appellate counsel acted reasonably and appropriately. Id. Garries then appealed the decision to the C.M.A. which denied his petition for extraordinary relief on June 9, 1994. See Nkosi, 40 M.J. 266.

## Question Presented

Should Garries' petition be denied in that Garries' claims of ineffective assistance of counsel have been given full and fair consideration by the military tribunals?

Suggested answer in the affirmative.

## Argument

**GARRIES' PETITION SHOULD BE DENIED IN THAT GARRIES' CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL HAVE BEEN GIVEN FULL AND FAIR CONSIDERATION BY THE MILITARY TRIBUNALS**

The United States District Courts have jurisdiction over habeas corpus petitions filed pursuant to 28 U.S.C. §2241, in which petitioners claim that they have been incarcerated due to proceedings which denied them their constitutional rights. This same statute also vests jurisdiction in the federal courts over persons imprisoned by a court-martial. "The writ of habeas corpus has limited scope; the federal courts do not sit to re-try cases de

novo but, rather, to review for violation of federal constitutional standards." Milton v. Wainwright, 407 U.S. 371, 377 (1972). Collateral review of a matter that has been addressed by military judicial tribunals is even more limited in scope. See Burns v. Wilson, 346 U.S. 147 (1953), Schlesinger v. Councilman, 420 U.S. 738 (1975).

When a military tribunal "has dealt fully and fairly with" allegations raised in a petition for writ of habeas corpus, "it is not open to a federal civil court to grant the writ simply to re-evaluate the evidence." Burns v. Wilson, 346 U.S. 137, 142 (1953) This Circuit has long held that "Burns is the law of the land" United States ex rel. Thompson v. Parker, 399 F.2d 774 (3rd Cir. 1968) cert. denied 393 U.S. 1059 (1968) (quoting Swisher v. United States, 237 F. Supp. 921, 938 (W.D. Mo. 1965) aff'd, 354 F.2d 472 (8th Cir. 1966). "[I]f the military gave full and fair consideration to claims asserted in a federal habeas corpus petition, the petition should be denied." Lips v. Commandant, United States Disciplinary Barracks, 997 F.2d 808, 811 (10th Cir. 1993) cert. denied 510 U.S. 1091 (1994). All available military remedies must be exhausted before collateral review is available. Gusik v. Schilder, 340 U.S. 128 (1950); Apple v. Greer, 554 F.2d 105, 107 (3rd Cir. 1977); Khan v. Hart, 943 F.2d 1261 (10th Cir. 1991).

Federal courts will not review claims not raised at all before military courts. If an issue is brought before a military review court and is disposed of, even summarily, the federal habeas court will find that the military tribunal has given the claim full and fair consideration. Watson v. McCotter, 782 F.2d 143, 145 (10th Cir. 1986) cert. denied, 476 U.S. 1184 (1986).

A federal habeas corpus court may only review petitions that assert errors of a substantial constitutional dimension. Dodson v. Zelez, 917 F.2d 1250 (10th Cir. 1990). Civil courts should refrain from transforming a denial of discovery into a violation of the Due Process Clause of the Constitution. United States v. Augenblick, 393 U.S. 352, 356 (1969). "[A]part from trials conducted in violation of express constitutional mandates, a constitutionally unfair trial takes place only where the barriers and safeguards are so relaxed or forgotten . . . that the proceeding is more a spectacle . . . or trial by ordeal . . . than a disciplined contest." Augenblick, 393 U.S. at 356. Collateral review of court-martial convictions is limited to claims raising issues of law that are not "intertwined with disputed facts previously determined by the military . . . ." Calley v. Calleway, 519 F.2d 184, 200 (5th Cir. 1975); Parker v. Levy, 417 U.S. 733 (1974).

Garries claims that his "appellate attorney's rendered ineffective assistance of counsel." (Petition at 1.). The

gravamen of Garries' claims of ineffective assistance of counsel are that: 1) his appellate attorneys incorporated certain prejudicial documents thus corroborating the Government's case; 2) his appellate counsel failed to raise an ineffective assistance of counsel claim during his C.M.A. proceedings; and, 3) appellate counsel failed to present the destruction of blood stained evidence in its petition before the United States Supreme Court. See Habeas Petition at 5, 8, 12. According to Garries, his appellate counsel's representation constitutes a finding of ineffective assistance of counsel entitling him to new appeals before the A.F.M.C.R. and the C.M.A.

First, Garries claims that the incorporation of certain affidavits and documents were "prejudicial and inflammatory" to his case. Habeas Petition at 6. However, the A.F.C.M.R. found that Garries "appellate counsel made an able effort to establish grounds for a new trial and raise doubt about critical trial testimony by filing the documents in question." See Nkosi, No. 94-03, 1994 WL 175766 *1. The Court concluded that appellate counsel acted reasonably and appropriately. Id.

In Garries second claim of ineffective assistance of counsel he argues that his second set of appellate counsel were ineffective because they did not assert that his first set of appellate counsel were ineffective when they submitted "clearly prejudicial documents." Habeas Petition at 9. The C.M.A., having

found that the submission of the documents to be relevant, concluded that Garries second set of appellate counsel were within the standard of reasonableness when they did not assert an ineffective assistance of counsel claim. See Nkosi No. 94-03, 1994 WL 175766 *1.

Finally, Garries claims that his appellate counsel were ineffective when they failed to present for review to the Supreme Court the destruction of blood stain evidence. Habeas Petition at 13. At his court-martial Garries sought to suppress the results of laboratory blood tests. The military judge denied the motion to suppress allowing the admission of the blood samples. See Garries, 19 M.J. at 856. On appeal Garries argued that the samples should have been suppressed, however, the A.F.C.M.R. found that the blood stain evidence was clearly relevant. Id. at 858. Furthermore, the C.M.A. found that there was no prejudicial error in admitting the blood samples into evidence. See Garries, 22 M.J. at 293.

The A.F.C.M.R. and the C.M.A. has "dealt fully and fairly with" Garries's claims of ineffective assistance of counsel. They should therefore be dismissed. See Burns v. Wilson, 346 U.S. 137, 142 (1953); United States ex rel. Thompson v. Parker, 399 F.2d 774 (3rd Cir. 1968), cert. denied, 393 U.S. 1059 (1968) To the extent that Garries is making any new claims of ineffective assistance of counsel, these too should be dismissed based on his failure to

raise them before the United States Air Force Court of Military Review and the United States Court of Military Appeals. See Watson v. McCotter, 782 F.2d 143, 145 (10th Cir. 1986), cert. denied, 476 U.S. 1184 (1986).

**Conclusion**

For the above-stated reasons, Garries' petition for a writ of habeas corpus should be denied.

Respectfully submitted,

MARTIN C. CARLSON
United States Attorney

MATTHEW E. HAGGERTY
Assistant U.S. Attorney
SHELLEY GRANT
Paralegal Specialist
228 Walnut Street, 2nd Floor
P.O. Box 11754
Harrisburg, PA 17108-1754
717/221-4482

Date: September 5, 2001

U.S. Air Force Court of Military Review.

UNITED STATES
v.
Airman First Class Brian K. GARRIES, United States Air Force.

ACM 24158.

Sentence Adjudged 17 March 1983.
Decided 16 Jan. 1985.

Accused, an airman first class, United States Air Force, was convicted by general court-martial convened at the United States Air Force Academy, Jeffrey W. Cook, J., of the premeditated murder of his wife, and he appealed. The United States Air Force Court of Military Review, Synder, J., held that: (1) the court-martial had subject-matter jurisdiction over the offense; (2) military judge did not err in directing reconstruction of the record after it was discovered that recording equipment had malfunctioned; (3) accused was not denied his right to civilian counsel; (4) accused was not improperly denied investigative assistance; (5) blood sample evidence was highly relevant and properly admitted; (6) statements of deceased were properly admitted to show her state of mind concerning events immediately preceding her murder; (7) clergy privilege did not apply to conversation between accused and church deacon; (8) jailhouse admission of accused to the offense was properly admitted; (9) evidence was sufficient to sustain conviction; (10) accused was not denied effective assistance of counsel; and (11) no basis existed for new trial.

Affirmed; petition for new trial denied.

West Headnotes

[1] Military Justice ⚷639
258Ak639

Murder of servicewoman by her husband was service connected, as indicated by guilty verdict reflecting fact finder's determination that the victim was killed on the military installation; hence, the court-martial had subject- matter jurisdiction over the offense.

[2] Military Justice ⚷1354
258Ak1354

Whether reconstructed testimony impacts the verbatim nature of the record depends on whether the omission is substantial or insubstantial; substantial omissions may be qualitative as well as quantitative, but omitted material may be sufficiently retrievable so that the record can be salvaged and pronounced substantially verbatim. UCMJ, Art. 54(a), 10 U.S.C.A. § 854(a); MCM 1969, par. 82, subd. *b*.

[3] Military Justice ⚷1354
258Ak1354

Though omission of witness' testimony due to malfunction of recording equipment for approximately five minutes was qualitatively substantial, the record as reconstructed was, in fact, substantially verbatim, given prompt and thorough action of the trial judge, not the least of which was directing reiteration of the unrecorded testimony. UCMJ, Art. 54(a), 10 U.S.C.A. § 854(a); MCM 1969, par. 82, subd. *b*.

[4] Military Justice ⚷1420
258Ak1420

[4] Military Justice ⚷1426
258Ak1426

Grant or denial of request for continuance is an interlocutory question, and, as such, ruling of the trial judge will not be reversed absent clear abuse of discretion resulting in prejudice to substantial rights of the accused. MCM 1969, pars. 57, 58, subd. *b*.

[5] Military Justice ⚷1188
258Ak1188

Military judge is required to weigh whether the issues are simple or complex, and liberally assess their merits in reaching his decision on request for continuance; judge may also balance the impact of continuance upon the availability of witnesses, including the logistics of bringing witnesses from distant locations.

[6] Military Justice ⚷1187.1
258Ak1187.1
(Formerly 258Ak1187)

Three months constituted reasonable continuance for civilian counsel to adequately prepare for trial of accused on charges of premeditated murder, and there was no abuse of discretion in not granting six-month period requested by counsel.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

[7] Military Justice 🔑501
258Ak501

Statute providing for provision of investigative services necessary for adequate defense to a person financially unable to obtain such services is inapplicable in trials by court-martial. 18 U.S.C.A. § 3006A.

[8] Military Justice 🔑933
258Ak933

Accused enjoys extensive rights of discovery under military practice.

[9] Military Justice 🔑1210.1
258Ak1210.1
(Formerly 258Ak1210)

Trial judge did not abuse his discretion in denying motion for disbursement of $1,500 to permit accused to retain investigative assistance, trial defense counsel having offered no cogent reasons why an Air Force investigator working under court-ordered confidentiality could not serve the defense purposes; indeed, counsel's declining of the Air Force investigator bordered on waiving the issue for appellate review. Military Rules of Evid., Rules 103(a), 302; U.S.C.A. Const.Amends. 5, 14; 18 U.S.C.A. § 3006A; MCM 1969, pars. 115, 116, 121.

[10] Military Justice 🔑511.1
258Ak511.1
(Formerly 258Ak511)

Since the United States was not a party to state criminal proceedings against the accused, state court decision that certain blood samples were inadmissible was not binding on military court in trial of accused for capital offense.

[11] Military Justice 🔑530
258Ak530

[11] Military Justice 🔑1023
258Ak1023

All forensic serology tests were conducted in good faith and in accordance with accepted scientific procedures, with no intent to withhold or destroy potentially exculpatory evidence and, furthermore, forensic serologist was available for full cross-examination; therefore, admission of blood samples did not violate accused's due process rights, despite destruction of many of the samples as the result of testing. U.S.C.A. Const.Amend. 14.

[12] Military Justice 🔑1026
258Ak1026

Bloodstain evidence was highly relevant and properly admitted in homicide case, given, inter alia, forensic serologist's testimony indicating likelihood that the blood, discovered on basement stairs and in defendant's car trunk, was that of the victim, who, according to pathologist, was not slain at the roadside scene of discovery of her body. Military Rules of Evid., Rules 401, 403.

[13] Military Justice 🔑1120
258Ak1120

Detective was shown to be qualified to testify as an expert with respect to bloodstain evidence admitted in homicide case, given his university training under the instruction of nationally recognized blood spattering expert and his actual experience extending to 20 to 30 cases. Military Rules of Evid., Rule 702.

[14] Military Justice 🔑1025
258Ak1025

[14] Military Justice 🔑1090
258Ak1090

Statements of deceased as to her intent to obtain a pregnancy discharge and leave the accused were not hearsay and were properly admitted through testimony of witnesses who knew or were related to the deceased, since deceased's state of mind or intent concerning her departure date was highly relevant to issue of likely situs of her murder. Military Rules of Evid., Rules 402, 803(3).

[15] Military Justice 🔑1026
258Ak1026

[15] Military Justice 🔑1087
258Ak1087

Statements uttered by the accused, to the effect that if party to whom they were directed didn't come and get accused, he was going to kill his wife, were properly admitted in homicide case through testimony of that party, which was clearly relevant on the issues of accused's intent and motive. Military Rules of Evid., Rules 403, 404, 404(b), 801(d)(2)(A).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

[16] Military Justice 1126.1
258Ak1126.1
(Formerly 258Ak1126)

Sergeant who was a deacon of his church but who was not an ordained pastor at the time of conversation with accused was not a person who could act as clergyman and accused did not reasonably believe that he was a clergyman; hence, conversation between them, in which accused indicated an inclination to harm victim, did not occur under circumstances amounting to privileged communication. Military Rules of Evid., Rules 403, 404(b), 503(b)(1, 2), 801(d)(2)(A).

[17] Military Justice 1106.1
258Ak1106.1
(Formerly 258Ak1106)

Testimony of accused's fellow prisoner concerning accused's jailhouse admission to homicide was sufficiently reliable to be admitted, despite possible bias of fellow prisoner by reason of agreement between him and state officials concerning possibly dropping some charges.

[18] Military Justice 641
258Ak641

Evidence was sufficient to sustain conviction of accused of the premeditated murder of his wife.

[19] Military Justice 1242
258Ak1242

Accused is entitled to be represented by effective counsel and to competent representation throughout the trial.

[20] Military Justice 1242
258Ak1242
Representation.

Strategic or tactical decisions made by trial defense counsel will not be second guessed on appeal.

[21] Military Justice 1242
258Ak1242

Affidavit of trial defense counsel reflected that decisions on various tactics were made only after weighing the potential impact and benefit to their client, the accused, and fact that appellate defense counsel could show how the case may have been tried differently did not amount to ineffective representation at the trial level.

[22] Military Justice 884.1
258Ak884.1
(Formerly 258Ak884)

Lieutenant colonel was not shown to be unable to be impartial, and military judge did not abuse his discretion by refusing to rule that the lieutenant colonel had willfully withheld information and by refusing accused's challenge for cause.

[23] Military Justice 1083
258Ak1083

Evidence establishing accused's voluntary consent to search of his vehicle was compelling and, hence, product of the search was not subject to suppression. Military Rules of Evid., Rule 314(e).

[24] Military Justice 1045.1
258Ak1045.1
(Formerly 258Ak1045)

Disposal of automobile allegedly used to transport homicide victim's body did not render any evidence seized therefrom inadmissible, since investigators were emphatic that nothing of evidentiary value remained in the vehicle, and accused had ample opportunity to reclaim possession of the vehicle before it was disposed of.

[25] Military Justice 1120
258Ak1120

Military judge did not abuse his discretion by allowing pathologist, a properly qualified expert, to testify that, in his opinion, victim's stab wounds were consistent with the intentional infliction of injury, such testimony going to issue of premeditation as well as aggravation. Military Rules of Evid., Rules 403, 702, 703.

[26] Military Justice 1277
258Ak1277

[26] Military Justice 1434
258Ak1434

Test for whether new trial will be granted on the basis of newly discovered evidence is well settled; evidence must be newly discovered since trial and not such that it would have been discovered by the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

petitioner at the time of trial in the exercise of due diligence, and, if considered by court-martial in light of all the other pertinent evidence, it must be such as would probably produce substantially more favorable result for the accused. MCM 1969, par. 109, subd. *d* (2).

[27] Military Justice 🔑1277
258Ak1277

[27] Military Justice 🔑1434
258Ak1434

Petitioner seeking new trial on the basis of newly discovered evidence must affirmatively show that an injustice resulted from the findings. MCM 1969, par. 109, subd. *d* (2).

[28] Military Justice 🔑1434
258Ak1434

Burden on petitioner seeking new trial on the basis of newly discovered evidence is heavier than that normally borne during appellate review, and such motions are not regarded with favor and will be granted only with great caution. MCM 1969, par. 109, subd. *d* (2).

[29] Military Justice 🔑1434
258Ak1434

Evidence proffered by accused in support of new trial on the basis of newly discovered evidence was either not "new" or was not such as would have been likely to have produced more favorable result. MCM 1969, par. 109, subd. *d* (2).

[30] Military Justice 🔑1277
258Ak1277

[30] Military Justice 🔑1434
258Ak1434

Even where a fraud is perpetrated upon the trial court, it must have had substantial contributing effect upon the findings in order to merit a new trial. MCM 1969, par. 109, subd. *d* (3).

[31] Military Justice 🔑1434
258Ak1434

Accused did not meet his burden of showing that a fraud was perpetrated on the court through perjured testimony so as to warrant new trial. MCM 1969, par. 109, subd. *d* (3).

[32] Military Justice 🔑1277
258Ak1277

[32] Military Justice 🔑1434
258Ak1434

Witness' recantation of testimony is viewed with disfavor in determining its effect upon an accused's request for new trial on the basis of fraud perpetrated on the court.

***848** Appellate Counsel for the Accused: Messrs. William Reynard, Sander Karp and David Miller, Denver, Colorado, Colonel Leo L. Sergi, and Major Conrad C. Baldwin, Jr.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert, Major Robert E. Ferencik, Jr., and Major Kevin L. Daugherty.

Before FORAY, SNYDER, and O'HAIR, Appellate Military Judges.

DECISION AND ORDER

SNYDER, Judge:

During mid morning on 13 June 1981 at the United States Air Force Academy, the accused observed his next door neighbor, Sergeant Carstensen, wearing what he thought to be a very funny hat. The accused prevailed upon Carstensen to go inside the accused's quarters so his wife, Airman Camille Garries, could also see the hat. Camille Garries was in the bathroom and only her head was visible to Carstensen as she looked around the bathroom door and smiled. Other than the accused, Sgt. Carstensen was the last known person to see Camille Garries alive. Her nude ***849** body was found on 15 June 1981 in a ditch near Colorado Springs, Colorado, the victim of blunt force trauma to her head. She also had superficial stab wounds which the pathologist opined were used to intentionally inflict pain. As a result of her death, the seven month female fetus with which she was pregnant asphyxiated.

The accused was convicted by general court-martial of the premeditated murder of his wife, Camille Garries, and sentenced to life imprisonment and accessory penalties. [FN1] Appellate Defense Counsel have submitted 17 assignments of error and a Petition For New Trial for our consideration. Having scrutinized all assignments of error, and the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

evidence at trial, we find no prejudice to the substantial rights of the accused and affirm.

FN1. The charge was referred to trial as a capital offense.

Because of her pregnancy, the victim planned to separate from the Air Force near the end of June 1981. Due to marital discord, she planned to separate from the accused and return to her home in Macon, Georgia, where she would have her baby. Expecting her arrival on 26 June 1981, her father had made an appointment for her with a local physician. There was evidence that the accused had voiced his displeasure over these plans. All with whom the victim frequently associated testified that the victim gave no indication of an intent to depart the area before 26 June 1981.

On 13 June 1981, however, the victim had simpler plans. She had an appointment to have her hair done at either 1300 or 1330 hours. She confirmed her appointment via telephone between 1100 and 1130 hours. During a phone conversation with a friend, Mrs. B, between 1130 and 1200 hours, she said she would drop by for a visit after her hair appointment.

Between approximately 1500 and 1530 hours, 13 June 1981, Lieutenant, then Sergeant, Duke received a call from the accused. He related that the victim had left him, that he was hurting emotionally, and asked Lt Duke to come over. Upon arrival, the accused stated he had last seen the victim at 1100 hours when he left to go for a walk to cool off after an argument between him and the victim. He said he found a note, the gist of which was, she was tired of the accused, tired of the Air Force, and she was leaving. Stating that he had burned the note, the accused showed Lt Duke ashes on the stove. After being shown the bedroom and giving the accused advice on how to protect himself from a deserting wife, *i.e.,* cancelling credit cards, etc., Lt Duke departed around 1800 or 1830 hours. Lt Duke also related that he had been in the accused's basement a few days before the victim's death. Duke needed some two-by-fours and the accused had some which the accused said he could have. Lt Duke stated that he did not take all of the two-by-fours.

A number of neighborhood residents encountered the accused during the afternoon of 13 June 1981. To approximately two he related that the victim had left him. When asked by another how was the victim, he replied simply, "I haven't seen her." To others he asked if they knew of any secluded areas where he could camp out with an unnamed woman. He did tell one person he wanted to camp out with the victim. Everyone he asked recommended either Stanley Canyon, the Garden Of The Gods, or both.

Around 2330 hours, 13 June 1981, the accused observed the Carstensens returning home and asked Sgt Carstensen to assist him in opening the trunk of his automobile, for he had lost the key some time ago. His car was in the carport at the time. Being tired from a full day's activities, Carstensen said he would do it the next day. The accused offered help in carrying the sleeping children from the car to their bedrooms. Mrs. Carstensen asked how was the victim and the accused replied, "fine." At approximately 0150 hours, 14 June 1981, Mrs. Carstensen answered a knock at her door. It was the accused, and he appeared upset and in tears. He asked her if she had seen the victim, stating that he had looked for her at ***850** a local night club and an apartment house. While at the door, Mrs. Carstensen noted the accused's car parked in the parking island rather than the carport.

At approximately 0900 hours, 14 June 1984, the Carstensens were still asleep when the accused knocked on the door. He wanted Carstensen to help get his car trunk open. The car was in the carport. Since the victim had "left him," the accused wanted to start moving out of his quarters. After being unsuccessful at entering by removing the back seat, Carstensen opened the trunk by removing the lock and inserting a screwdriver and turning it as if turning a key. He showed the accused how to employ that method. He then assisted the accused in cleaning out the trunk, including driving the accused to the auto hobby shop where they vacuumed out the trunk. [FN2] On the return home, the accused had Carstensen drive over a number of dirt roads because he was "curious" about them. Upon arrival at their quarters, the accused asked him to *back* the car into the carport. Because they were not successful in cleaning the trunk thoroughly, the accused asked for something with which to cover the trunk's floor. Carstensen provided a plastic mattress container/ cover from a single bed mattress.

FN2. The accused knew how to drive an automobile but, for some reason not disclosed at trial, he did not possess a current license.

At approximately 0930 hours, 14 June 1981, the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

accused saw SSgt Green mowing his lawn. He said he had a problem and wanted to talk. He asked Green if he knew where he could hide a body, providing a facetious reason about a "queer" he was going to "waste" if he did not stop bothering him. Green did not take him seriously. Stating he wanted to camp out with a young lady, the accused asked how to get to Stanley Canyon. Despite Green's protestations of being pressed for time, the accused insisted that he take him to Stanley Canyon. While at Stanley Canyon the accused did not appear to be looking for a campsite, but was always looking down.

During early afternoon, 14 June 1981, another airman saw the accused walking and gave him a ride. After telling the accused he was headed to the gym to play basketball, the accused decided he would come along. After playing basketball, they went to the noncommissioned Officers Open Mess for about an hour. While driving the accused home, the accused asked how to get to the Garden Of The Gods. The airman gave the accused directions, including driving out one of the Academy's gates and showing the accused how to access Interstate Highway 25. The victim's body was found not far from Garden Of The Gods Road.

When he returned home between 1630 and 1700 hours, Carstensen noticed that the accused's car was in the carport front first and he was washing the car. Believing the victim to be gone, the Carstensens invited the accused to have supper with them on 14 June 1981. The accused was back and forth between his quarters and the Carstensens', and he acted edgy, pacing between the windows. Stating that he did not want to stay in his quarters with the victim gone, he asked, and was permitted, to spend the night with the Carstensens. Interestingly, the victim had moved out for approximately two weeks in May 1981, but the accused never asked the Carstensens if he could spend the night.

The accused "slept" the entire night of 14 June at the Carstensens'. However, he called the victim's father at approximately 0110 hours (MDT), 15 June 1981, and asked if he had seen the victim. He told the victim's father she had left walking at 1100 hours Saturday because he had taken the car keys from her. He also said that she wore her jean skirt. Telephone records reflect that this call was made from the accused's quarters.

Mrs. Carstensen did not hear the sound of a car engine during the evening of 14 June 1981. However, the driveways from the carports are sloped. The accused came ***851** over between 0730 and 0800 hours on 15 June 1981, to use their phone because he was late for work. He asked her what time was the garbage picked up, and she told him on Monday mornings. Between 1600 and 1630 hours, 15 June 1981, the accused was washing his car again.

On 15 June 1981, the accused filed a missing person report on the victim. This information was provided to investigators of the El Paso County, Colorado Sheriff's Department, who had assumed investigative jurisdiction after the victim's body was found in the interim. The investigation up to that point had indicated it was unlikely the victim was slain where she was found. After identification of the victim by the accused, investigators accompanied him to his quarters. The accused related information to the investigators similar to what he told Lt Duke, stating the only items victim took with her were $600.00 which he kept in a drawer for emergency use, and a favorite denim skirt which presumedly she wore. However, Mrs. B, Mrs. BT, and the victim's father, all opined that victim's advanced pregnancy precluded her from wearing that particular skirt.

Investigation of the quarters revealed neither signs of a forced entry nor a struggle. The master bedroom contained what appeared to be all of victim's belongings, including her purse, her military identification card, and her spectacles, without which she had very poor vision. Further inquiry revealed what appeared to be blood spatters on some of the basement steps.

While investigators were searching the accused's quarters, he told Mrs. Carstensen, "You know I didn't do it because I was with you all weekend."

A search of the accused's automobile revealed an apparent blood stain on the latching device of the trunk. Also seized was a piece of fibrous material attached to a screw which had secured the lining to the trunk's floor. Investigators also observed that portions of the accused's car apparently had been washed, but not the entire car. Also noted was the fact that the trunk was much cleaner than the interior.

On 17 June 1981, Carstensen asked accused if he could have the mattress cover back. The accused said he had thrown it away in the garbage. While looking for the mattress cover, Carstensen noticed two items in his trash can. Responding to his phone call, investigators removed two pieces of cardboard

which appeared to be trunk liners. The accused's car did not contain any trunk lining when it was searched. Although he could not state with certainty, Carstensen believed the accused's trunk had liners when they cleaned it on 14 June 1981. Microscopic examination of the fibrous material taken from the accused's car trunk and one of the cardboard pieces revealed that they were, at one time, one piece. The trunk lining contained human blood stains.

I

[1] Appellate Defense Counsel aver that the court-martial lacked subject matter jurisdiction over the offense, their primary contention being that the victim was not killed on the installation. *See Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971); *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). The military judge made extensive findings of fact in his ruling that the court did have jurisdiction. His findings are more than supported by the evidence of record and are fully accepted. The charged offense was clearly service-connected. *Relford v. Commandant, supra.* Additionally, the factfinders were instructed that one of the elements they had to find beyond a reasonable doubt was that the victim was killed at the United States Air Force Academy. Their verdict reflects their factual finding that the victim was killed on the installation. Accordingly, the offense was service-connected. *Relford v. Commandant, supra; see United States v. Williams,* 17 M.J. 207 (C.M.A.1984).

II

[2] The next assertion of error is that the military judge erred in directing a reconstruction of the record. We disagree. ***852** During the latter portion of the direct examination of Sgt Carstensen, the recording equipment malfunctioned for approximately five minutes. As a result the last portion of his direct testimony and a brief portion of his cross-examination were not recorded. After being informed of the malfunction by the court reporter, the trial judge excused the members for the remainder of the day. He directed the reporter to transcribe what she had on tape so that a determination could be made on the missing testimony. He also directed a reconstruction.

The reconstruction was accomplished by using trial and defense counsel's notes [FN3], the testimony which was, in fact, recorded, and the assistance of the witness, Sgt Carstensen. The trial judge checked the product of counsel's, the reporter's, and Carstensen's efforts against his personal and copious notes which he had amassed during the course of the trial to that point. He found that there was no doubt that the substance of the unrecorded testimony had been reconstructed if not the exact words. All parties to the trial concurred with the trial judge's finding. However, as a result of his thorough review of the applicable precedents of this Court and the Court of Military Appeals, he directed that Carstensen reiterate the portion of his testimony which was lost notwithstanding objections by both trial and defense counsel. *See United States v. English,* 50 C.M.R. 825 (A.F.C.M.R.1975); *cf. United States v. Hensley,* 7 M.J. 740 (A.F.C.M.R.1979), *pet. denied,* 8 M.J. 42 (1980). He also informed trial defense counsel that he *would not* be limited to the boundaries of his original cross-examination.

FN3. Counsel had not prepared verbatim questions for their respective examinations, but had outlined the specific areas to be covered. *Cf. United States v. Lashley,* 14 M.J. 7 (C.M.A.1982).

Except where specifically provided, records of trials by general court-martial are required to be verbatim. Article 54(a), U.C.M.J., 10 U.S.C. § 854(a); Manual for Courts-Martial, 1969 (Rev.), para. 82*b*. This requirement has been interpreted to mean *substantially* verbatim. *United States v. Lashley,* 14 M.J. 7 (C.M.A.1982); *United States v. Nelson,* 3 U.S.C.M.A. 482, 13 C.M.R. 338 (1953). Whether reconstructed testimony impacts the verbatim nature of the record depends on whether the omission is substantial or insubstantial. *United States v. Gray,* 7 M.J. 296 (C.M.A.1979); *United States v. Sturdivant,* 1 M.J. 256 (C.M.A.1976). Substantial omissions may be qualitative as well as quantitative. *United States v. Lashley, supra.* However, the omitted material may be sufficiently retrievable so that the record can be salvaged and pronounced substantially verbatim. *United States v. Eichenlaub,* 11 M.J. 239 (C.M.A.1981).

[3] The reconstructed testimony consists of five legal pages. Sgt Carstensen was, without doubt, a crucial witness; thus, the omission, albeit brief, is qualitatively substantial. However, due to the prompt and thorough action of the trial judge, not the least of which was directing reiteration of the unrecorded testimony, this record is, in fact, substantially verbatim, and we so hold. With the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

exception of preserved verbatim questions of counsel, the same unusual combination of factors which preserved the verbatim nature of the *Lashley* record also preserved the record of the instant case. *United States v. Lashley; United States v. Eichenlaub,* both *supra.*

Even were we to find that a presumption of prejudice arose from the omission, the Government has more than rebutted the presumption. *See United States v. Hensley, supra.* Additionally, we find no prejudice by virtue of the trial judge directing the witness to reiterate the unrecorded testimony. Promptly reiterating unrecorded testimony is no more remarkable than the court's recalling of a witness or having the transcript read *in lieu* of recalling a witness. [FN4]

FN4. The trial judge asked trial defense counsel if he concurred that the unrecorded testimony had been substantially reconstructed rather than asking the accused directly. Appellate defense counsel contend that the requirement of a verbatim record is a personal right of the accused which only he can waive, as opposed to a statutory requirement which does not confer individual rights. Our disposition of this issue renders it unnecessary to address it, although we have significant doubt as to its validity.

***853 III**

[4] Appellate Defense Counsel also assert that the accused was denied his right to civilian counsel. We find as a matter of fact that he was not. After being advised of his right to counsel and his options thereunder, *United States v. Donohew,* 18 U.S.C.M.A. 149, 39 C.M.R. 149 (1969), the accused indicated that he desired representation by civilian counsel. Detailed military defense counsel advised that the accused had consulted with a named civilian counsel associated with the American Civil Liberties Union (ACLU), but that he was presently unavailable for a personal appearance. The trial judge granted a seven day continuance so that civilian counsel could make a personal appearance.

When proceedings resumed, Mr. B advised that he was willing to represent the accused, but he would require a continuance of six months. The reasons proffered for requesting six months were that their prior experience with capital cases indicated that highly extensive preparation, including investigation, was required; that they were involved with other cases and that their prior docket was inflexible; and, since they would be representing the accused *pro bono,* they needed to generate income via other cases.

After making detailed findings, the trial judge concluded that:

> Civilian counsel cannot with any particularity explain to this court why one- half a year is the exact time period needed to accurately prepare for this case... I am also satisfied that some time period less than six months will give the four defense counsel ample opportunity to prepare a defense in this case. Based on the nature of the charged offense, and with an attempt to exercise caution in this area, I will grant a defense requested delay for a period of three months.

At this point, civilian counsel requested permission to withdraw from the case, stating they absolutely required six months. The trial judge granted their request to withdraw. Pursuant to the accused's expressed desire to seek out other civilian counsel who might represent him *pro bono,* the trial judge granted an additional three day continuance. At the next session on 21 January 1983, the accused stated that the ACLU was still his only recourse to free civilian counsel. The trial judge considering that issue resolved, directed that the proceedings resume on 28 February 1983.

A request for a continuance of the proceedings may be made by either party thereto and should be granted upon a showing of reasonable cause. Article 40, U.C.M.J., 10 U.S.C. § 840; M.C.M., para. 58*b*. The granting or denial of a request for a continuance is an interlocutory question. M.C.M., paras. 57, 58 *b*. As such, the ruling of the trial judge will not be reversed absent a clear abuse of discretion which results in prejudice to the substantial rights of the accused. *United States v. Menoken,* 14 M.J. 10 (C.M.A.1982); *United States v. Henry,* 1 M.J. 533 (A.F.C.M.R.1975)
.

[5] The military judge is required to weigh whether the issues are simple or complex, *United States v. Abilar,* 14 M.J. 733 (A.F.C.M.R.1982), *pet. denied,* 15 M.J. 324 (1983), and liberally assess their merits in reaching his decision. *United States v. Henry, supra.* The trial judge may also balance the impact of a continuance upon the availability of witnesses, including the logistics of bringing witnesses from distant locations. *United States v. Lambert,* 17 M.J. 773 (A.F.C.M.R.1983), *pet. denied,* 18 M.J. 127 (1984).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

[6] We find and hold that the trial judge in the instant case did not abuse his broad discretion. He needed no reminder that the accused was on trial for his life. The accused's desires were balanced against the fact that the offense had occurred almost two years earlier, the Government faced the necessity of bringing ***854** witnesses from other locations, including foreign countries, and the time and preparatory effort already expended by his two detailed military defense counsel. After doing so, he determined that three months constituted a reasonable continuance for civilian counsel to adequately prepare for trial.

After reviewing the basis for the trial judge's decision, we find no abuse of discretion. His actions were eminently reasonable.

IV

[7] The accused next complains that he was improperly denied investigative assistance. Trial defense counsel applied to the convening authority for disbursement of $1,500.00 with which to retain investigative assistance, citing Article 46, U.C.M.J., 10 U.S.C. § 846, as authority. The request was denied and trial defense counsel renewed it via a motion at trial. As an alternative to the motion, the defense requested the trial judge to hold an *ex parte* hearing under 18 U.S.C. § 3006A. This apparently was an attempt to bring the proceedings within the parameters of 18 U.S.C. § 3006A. The trial judge denied the motion.

In denying the motion, the trial judge referenced the fact that 18 U.S.C. § 3006A [FN5] is inapplicable to trials by court-martial, and the fact that the defense had received full access to all governmental investigative reports, etc. He did not end the matter there, however; for he also advised the defense that he would direct the assignment of an Air Force investigator [FN6] to the defense who would work under a court order of confidentiality. The defense declined the proffer of the Air Force investigator. [FN7]

FN5. 18 U.S.C. § 3006A(e) reads in part as follows:
(1) Upon Request. Counsel for a person who is financially unable to obtain investigative ... services necessary for an adequate defense may request them in an ex parte application....

FN6. Presumably an Air Force Office of Special Investigations (OSI) special agent.

FN7. The defense also requested as an alternative, a three month continuance so that the accused could save $1,500.00 of his personal funds. It appears that the money was requested for an investigative report already accomplished rather than for an investigator. A local private investigator had apparently been retained by the accused during local civilian proceedings, but would not release the report because of nonpayment of the fee.

As noted by the trial judge, 18 U.S.C. § 3006A is inapplicable in trials by court-martial. *United States v. Johnson,* 22 U.S.C.M.A. 424, 47 C.M.R. 402 (1973); *United States v. Hutson,* 19 U.S.C.M.A. 437, 42 C.M.R. 39 (1970). However, in an effort to ameliorate this fact, appellate defense counsel aver that due process compelled the granting of the motion if not the statutory provision, as well as M.R.E. 706(a).

[8] During oral argument appellate defense counsel again argued vigorously for *de facto* application of 18 U.S.C. § 3006A via the due process route. One facet of their reasoning is that to be constitutionally effective as required by the Sixth Amendment, defense counsel must be independent; and, the *ex parte* hearing is a means of preserving that independence by allowing trial defense counsel to justify requests for an investigator without divulging potential witnesses or other defense tactics in the presence of the prosecution. Consequently, appellate defense counsel argue, the denial of the *ex parte* hearing deprived trial defense counsel of that independance and, in effect, strapped trial defense counsel's hands, thereby rendering them ineffective. The argument fails, primarily because of two reasons.

First, courts-martial are creatures of statute. Their parameters are established by Congress. *Ex parte* hearings simply are not authorized. See *United States v. Wilkerson,* 1 M.J. 56, 57 n. 1; *United States v. Dean,* 13 M.J. 676 (A.F.C.M.R.1982). Prior to the Military Justice Act of 1968, Pub.L. 90-632, 82 Stat. 1335 (1968), only limited matters could be handled outside ***855** the hearing of the members, and these were authorized only in general courts-martial. *United States v. Baca,* 16 U.S.C.M.A. 311, 36 C.M.R. 467 (1966). The only provision of the Military Justice Act of 1968 which authorizes out-of-court hearings is Article 39(a), and it specifically requires the presence of trial counsel as well as defense counsel and the accused. Article 39(a),

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

U.C.M.J., 10 U.S.C. § 839(a); M.C.M. paras. 53*d*, 57*g* (2). Since 18 U.S.C. § 3006A is part of the Criminal Justice Act of 1964, Pub.L. No. 88-455, 78 Stat. 552 (1964), we must assume that Congress was well aware of its existence during the revision of the Military Justice Act of 1950 and easily could have included a similar provision in the 1968 Act. [FN8]

FN8. During oral argument, appellate defense counsel also relied on the American Bar Association Standards Relating to Criminal Justice, Providing Defense Services, Standard 1.5, because some of those standards have been adopted for Air Force courts-martial. However, Air Force Manual 111-1 (2 July 1973), Military Justice Guide, para. 1-11, provides that standards inconsistent with the U.C.M.J. are not applicable. That is why Standard 1.5 dealing with supporting services is applicable only in principle. USAF Judiciary Special Subject Letter No. 49, ABA Standards for The Administration of Criminal Justice, (JAJ 82-3), 16 February 1982.

Second, that part of the statute which authorizes funds for services other than counsel, *i.e.*, investigative services, 18 U.S.C. § 3006A(e), is procedural. In fact, its very terms reflect it to be a matter of legislative grace rather than a fundamental right. *See United States v. Ray,* 367 F.2d 258 (8th Cir.1966), *cert. denied,* 386 U.S. 913, 87 S.Ct. 863, 17 L.Ed.2d 785 (1967). Again, we must assume that had Congress seen fit, it could have included similar provisions in the Uniform Code of Military Justice. One obvious reason why Congress did not do so is because it chose other means to protect an accused's access to evidence which may aid in preparing a defense.

Unlike the civilian sector, Congress has specifically provided that the prosecution *and* defense have equal access to witnesses and other evidence. Article 46, U.C.M.J., 10 U.S.C. § 846; M.C.M. para. 115. Additionally, the Article 32, 10 U.S.C. § 832 Investigation exists primarily as a discovery tool for the accused as well as a barrier against groundless charges. Further, an accused enjoys extensive rights of discovery under military practice. *United States v. Franchia,* 13 U.S.C.M.A. 315, 32 C.M.R. 315 (1962) ; M.C.M. para. 115*c*. The means to ferret out evidence are clearly provided an accused. Consequently, military procedures accomplish the same purpose as 18 U.S.C. § 3006A, which is ensuring an accused is able to prepare for trial.

[9] The trial judge did not abuse his discretion in denying the motion. Trial defense counsel offered no cogent reasons why an Air Force investigator working under court ordered confidentiality could not serve their purposes. *See United States v. Babbidge,* 18 U.S.C.M.A. 327, 40 C.M.R. 39 (1969), and the trial judge's order therein which predated M.C.M. para. 121 and M.R.E. 302. The order of confidentiality would have prevented defense leads from turning into possible evidence against the accused. *Cf. Marshall v. United States,* 423 F.2d 1315 (10th Cir.1970) (reversible error where trial judge directed FBI to investigate defense leads and witness found as a result of defense request eventually testified *against* the defendant). In fact, trial defense counsel's declination of the Air Force investigator bordered on waiving the issue for appellate review. *See* M.R.E. 103(a).

We find that the accused was not denied fair opportunity to prepare for trial or equal access to evidence and witnesses. *See* M.C.M. paras. 115, 116; *United States v. Johnson, supra.*

V

[10] Appellate defense counsel also contend that the military judge erred in not granting the Motion To Suppress Blood Samples. The assignment of error has two prongs; (1) Admitting the blood samples violated the accused's rights to due process and (2) The samples lacked relevancy to the charged offense.

***856** As mentioned in the facts, El Paso County, Colorado investigators discovered what appeared to be blood stains on some of the basement steps of the accused's quarters, and on certain areas of the trunk of the accused's car. The front portion of the affected steps, called stair treads, were removed with hammer and chisel. So was the latching device of the trunk. These items, along with the trunk liners, the screw and fibrous material, and a sample of the victim's blood, were forwarded to the Federal Bureau of Investigation (FBI) Laboratory in Washington, District of Columbia, for analysis.

The stains on all of the items but one stair tread were consumed by the test procedures employed at the FBI laboratory. No photographs were taken either of the tests or the test results. Neither was there any representative of the accused present.

Criminal proceedings for the victim's murder were

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

initially brought in the El Paso County, Colorado District Court. However, the Motion To Suppress the blood sample evidence was granted because the Court ruled that the Government had destroyed potentially exculpatory evidence via the FBI testing. This ruling was affirmed on interlocutory appeal by the Colorado Supreme Court. *See People v. Garries,* 645 P.2d 1306 (Col.1982). Consequently, proceedings in the District Court ended via *nolle prosequi.* Subsequently, charges were preferred under the U.C.M.J.

Appellate defense counsel submit various arguments, including collateral estoppel, to support their contention that the decision of the Colorado Supreme Court should have been binding upon the court-martial. The matter need not detain us. The United States was not a party to the state proceedings against the accused. Thus, a Colorado court decision thereon is not binding on a military court.

[11] On the substantive issue, the military judge found specifically that all tests were conducted in good faith and in accordance with accepted scientific procedures--a fact conceded by a defense expert witness--and with no intent to withhold or destroy potentially exculpatory evidence. The trial judge's findings are amply supported by the evidence and are accepted. Therefore, since the FBI forensic serologist was available for full cross- examination, *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 80 L.Ed.2d 413 (1984), and *United States v. Frost,* 19 M.J. 509 (A.F.C.M.R.1984) are dispositive of the issue. We turn now to the issue of relevancy.

[12] Doctor B, the forensic pathologist who examined the victim at the scene of her discovery and performed the autopsy, concluded that the victim was not slain at the scene of her discovery. Mr. T, the FBI forensic serologist, conducted the testing of the items sent to the FBI laboratory. His test results revealed the presence of blood stains on the seven stair treads from the accused's basement, the trunk latch, and the trunk liners.

Appellate defense counsel aver that relevancy is lacking due to the absence of evidence firmly establishing a source for the stains. The accused elicited evidence at trial which was intended to show that the stains had no connection with the victim's demise; namely, that the accused's dog fell down the stairs on one occasion and injured itself, and that the victim suffered from frequent nosebleeds. Lt. Duke testified that while the accused was explaining items which investigators found in his quarters, the accused related that the victim had nosebleeds so severe that at times "she had to walk around with a bucket." We find these assertions unpersuasive.

Mr. T testified that the blood stains were human blood stains; they could not have come from a dog. Additionally, Lt. Duke saw the dog shortly after the fall and did not observe an appreciable amount of blood around the injury. The crucial issue is the matter of the blood stains' grouping.

The victim's blood was from the B Group with the Enzyme PGM type 2-1. The accused's blood is from the O Group. To ascertain a blood sample's grouping, accepted testing procedures require two separate ***857** tests, the Absorption Elution Test and the Lattes Crust test. The Elution Test reveals the antigen present while the Lattes test reveals the particular antibody. Mr. T advised that in order to have a positive finding the two tests must concur; otherwise, his procedures require that his findings be recorded as inconclusive.

As stated above, all items tested revealed the presence of human blood stains. However, with the exception of one of the stair treads and the trunk liners, the stains were of insufficient quantity to facilitate grouping. As for the one stair tread, the Elution Test revealed the presence of the B and H antigen, but the Lattes Test did not reveal the antibody. Therefore, the test was inconclusive as far as showing that the stain was Type B. However, Mr. T was still able to state that Type O and A could be excluded as the source of the stain because of the B antigen. He stated that since the H antigen is present in all blood groups, it was possible that the H antigen may have come from an AB source, and possibly an O source. However, that likelihood was highly remote.

The results were similar for one of the trunk liners. The B antigen was present, but there was insufficient quantity to find the antibody. Because there were no other antigens present, he could exclude Type A and O individuals but not AB. The other trunk liner, however, revealed somewhat more detail. The tests of the other trunk liner revealed that the blood stain was Type B with the Enzyme PGM 2-1, the same as the victim's.

Mr. T advised that although there is a somewhat higher rate among the Black population, approximately ten percent of the general population

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

has Type B blood, and 36% has PGM 2-1. Because the enzymes are independent of the blood groupings, the statistical occurrence of the combination of B PGM 2-1 is approximately three and six-tenths (3.6) percent of the general population.

Appellate defense counsel argue that even if one assumes that the victim was the source of the blood stains, there is no evidence that they are the result of violence, especially recent violence at the hands of the accused. *Ergo,* they simply lack relevancy. This argument, however, views the blood stains in a vacuum.

The forensic pathologist opined that the victim was not slain at the scene of her discovery. Investigators found what appeared to be substantially all of the victim's belongings in the master bedroom of the accused's and victim's quarters. Detective G testified that the basement showed signs of a thorough cleaning. The steps had swipe marks on each side which appeared to have been made by a mop, and that when a flashlight was held at a certain angle, cleaning marks could be seen on the floor. Additionally, since blood spatters were found on the underside of the step risers as well as the stair treads, it was unlikely that the blood stains fell from above as if from a nosebleed. The bathtub showed signs of having been used to clean a mop or dump a mop bucket. This residue tested negative for the presence of blood, but Mr. T advised that immersing the mop in water would render the detection of blood less likely. The master bedroom and the hallway smelled of fresh paint, and there were drop cloths visible.

Detective Green also testified that the spatters on the stair treads were not consistent with blood dripping down. He also opined that the spatters were low and medium velocity spatters and that they originated from a frontal impact approximately 45 degrees lower than the stair treads. The indisputable inference is that the blood spatters resulted from the victim being struck with a blunt instrument. Dr. B opined that among other objects, the victim's wounds were consistent with being struck with a two-by-four.

M.R.E. 401 defines relevant evidence as "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." When this definition is applied to the state of the evidence in the instant case, to ask whether ***858** the blood stain evidence had *any* tendency to establish whether the victim was slain in her home begs the question. The evidence was clearly relevant, and its probative value was not even remotely outweighed by any possible prejudice. *See* M.R.E. 403.

The blood stain evidence was also relevant in another sense. Mr. Kirk testified that while incarcerated with the accused, the accused admitted to him that he killed the victim. We will deal with Mr. Kirk's testimony in more detail *infra;* nonetheless, the blood stain evidence was highly relevant on the issues of corroborating the accused's admission and weighing Mr. Kirk's credibility.

VI

[13] In a further effort to attack the relevancy of the blood stain evidence, appellate defense counsel aver that it was error to allow Detective Green to testify as an expert. His testimony on the blood stains is set forth above. We find that the military judge did not abuse his discretion by qualifying Detective Green as an expert.

The main prerequisite for qualification as an expert is that the witness be qualified by knowledge, skill, experience, training, or education. M.R.E. 702. Detective Green testified that he received training at Colorado University under the instruction of a nationally recognized blood spattering expert. The training included flight characteristics of blood, relative velocities, spatter patterns, directions, and angles, etc. In addition to lectures, etc., the training also involved numerous laboratory experiments, and written examinations. His actual experience extended to 20 to 30 cases. We agree with the ruling of the trial judge. Detective Green possessed special training and skill which could aid the factfinders in making their determination. The defense was free to attack the weight to be accorded his testimony.

VII

[14] The next assignment of error is that the statements of the deceased were erroneously admitted. The evidence in question is the testimony of witnesses who knew or were related to the deceased that she intended to obtain a pregnancy discharge and leave the accused, but not until near the end of June 1981. Appellate defense counsel contend that this hearsay evidence was wrongfully admitted to prove the truthfulness of the statements in order to show the accused had a motive to kill the victim. We disagree.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

The accused told several witnesses that the victim had left him a note to the effect that she was deserting the Air Force as well as leaving him. As stated earlier, the accused claimed to have burned the "note." Under these circumstances, the victim's state of mind or intent concerning her departure date was highly relevant to the issue of the likely situs of her murder. M.R.E. 402. M.R.E. 803(3) provides in part as follows:

> The following is not excluded as hearsay: A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health)....

Under the circumstances, testimony relating to statements made by the victim which reflected her state of mind concerning when she would depart the area clearly qualified under M.R.E. 803(3). The prosecution did not need this evidence to "bootstrap" onto a motive by the accused. As we will discuss *infra,* the accused provided that himself.

VIII

[15] Appellate defense counsel also contend that the testimony of Sgt Burt should not have been allowed. Sgt Burt testified that he was aware that the accused and the victim were having marital problems. On four or five occasions while arguing with the victim, the accused would call Sgt Burt and ask him to come and get him so they could talk. The accused would be angry when he called. Sgt Burt related that these occurrences generally followed the same scenario during the time frame of April to June 1981. On one occasion when ***859** he was attempting to calm the accused, the accused said to him as follows: *"Rob, I swear, if you don't come and get me I'll kill her."*

Sgt Burt related that he would take the accused to a club for a drink and talk things over and then take him home. He also advised the accused to move into the barracks. He estimated that the last time this occurred was one week prior to the victim's death.

Since the statement in question was uttered by the accused, it is admissible unless excluded by some other rule of evidence. M.R.E. 801(d)(2)(A). Appellate defense counsel contend that this evidence should have been excluded under M.R.E. 404, and that it did not qualify under M.R.E. 404(b). Rule 404(b) reads, in part, as follows:

> Evidence of other crimes, wrongs or acts ... may ... be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Although the comment is premised with a condition, the utterance of the accused could be liberally construed as a threat. That need not detain us, however, for we will assume that the comment and circumstances qualify as a wrong or act. *See United States v. Woodyard,* 16 M.J. 715, 716 (A.F.C.M.R.), *pet. denied,* 17 M.J. 204 (1983).

To say that the evidence established that the accused and the victim were having marital problems is to engage in understatement. There was also evidence that the accused and the victim argued over the victim's plans to leave and have the baby in Georgia. Under these circumstances, the testimony in question was clearly relevant on the issues of the accused's intent and motive. There was a clear nexus and the acts were certainly not remote. Thus, the trial judge did not abuse his discretion in admitting the evidence. *United States v. Woodyard, supra;* M.R.E. 403.

IX

[16] Appellate defense counsel also aver that the testimony of Sgt Hinton should have been excluded pursuant to the Clergy Privilege. M.R.E. 503. This assignment of error fails both legally and factually.

This assignment of error arises somewhat by happenstance; namely, the accused's quest for information *vis a vis* counselling. The accused and Sgt Hinton were neighbors and apparently attended the same off-base church. During late May 1981, the accused appeared at Sgt Hinton's quarters. The accused was upset over the victim's pending departure. He asked Hinton if he knew the whereabouts of the pastor, and Hinton informed him the pastor was out of town. The accused then asked Hinton to the accused's car so they could talk.

Sgt Hinton was an ordained minister at the time of the trial. However, on the evening in question, he was a Deacon of his church. Hinton related that in his church's hierarchy the pastor, the assistant pastor, and the associate ministers, were above the deacons. He related that the deacons counselled only on biblical matters, but even then only when the pastors were otherwise occupied. Hinton stated specifically that he was not given responsibility to do spiritual counseling, for that was the pastor's job. His minister's license is dated 14 June 1981 and he was not ordained until 8 August 1982. Hinton advised that

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

one cannot perform any substantive pastoral duties until after ordination.

On the evening in question, Hinton was neither licensed nor ordained. Additionally, he testified that he never held himself out to the accused or anyone else as a minister, but only a friend. He added that the accused never asked that their conversations be considered confidential. Sgt Hinton testified that, had he felt he was acting as a minister on the night in question, he would never have disclosed the conversation to investigators or be testifying.

***860** First, we hold that Sgt Hinton was not a person who could act as a clergyman. M.R.E. 503(b)(1). Second, we find that the accused did not reasonably believe that Hinton was a clergyman. Third, we find that the conversation between Hinton and the accused was not under circumstances amounting to a privileged communication. M.R.E. 503(b)(2). Therefore, we find that the trial judge properly allowed Hinton's testimony. *See generally,* Annot. 71 A.L.R.3d 794 (1976); M.R.E. 801(d)(2)(A), 404(b), 403.

As mentioned above, Sgt Hinton related that the accused was upset over the victim's pending departure when the accused arrived at his quarters. While sitting in the accused's car and talking, the accused said, "I can't take it anymore;" and then while striking the car's dashboard with both fists, the accused said, "*I should bust her in the face.*" Hinton stated that the accused struck the dash with sufficient force to break it.

X

[17] Although the Government adroitly pieced together many separate and distinct items of circumstantial evidence, it was a jailhouse admission which was the accused's undoing. Thus, we now come to our most crucial factual determination; the credibility of Mr. Kirk. The accused made Kirk's acquaintance while they were incarcerated in the El Paso County, Colorado jail. Upon the accused's arrival in jail, Kirk had been confined for six months for receiving a stolen shotgun. He had received a suspended sentence, but during the time frame of the accused's trial, he was facing probation revocation as well as a charge for auto theft. In sum, Kirk faced a possible sentence of 11 years for his travails. Kirk's extracurricular activities were not confined to the civilian sector. While serving in the Army he was convicted by special court-martial for assaulting an officer. In exchange for his truthful testimony, state officials agreed that the probation revocation and the auto theft charge would be dropped.

Kirk was the Ward Representative of the jail, and the accused was placed in his ward. Their initial contact was merely Kirk's asking him his name and introducing him to the other inmates. The accused told Kirk he was confined for "hitting a cop's car." At that time, or perhaps later, Kirk had, in fact, associated the newspaper accounts of the victim's murder with the accused's name, but he did not challenge the accused's statement of why he was jailed.

Approximately two weeks later, the accused was apparently on the short end of "The Dozens" [FN9] with another inmate, and Kirk had to break up a physical altercation between them. Later that day, the accused entered Kirk's cell and talked about hitting the police car. No one else was present. Kirk rebuked the accused for lying and informed him that he knew the real reason for the accused's confinement. When the accused challenged his knowledge, Kirk told him and he looked very surprised. Later that day in another conversation, Kirk told the accused not to worry about anyone else finding out. Since he was first in the ward to see the daily paper, Kirk told the accused he would screen the paper from the other inmates. Apparently the accused's temper frequently embroiled him with other inmates, for Kirk's conversations with him flowed from Kirk calming him down. Kirk stated that he advised the accused to stay calm for he was already in enough trouble without adding to his problems.

FN9. "The Dozens" consist of the participants verbally deriding one another as contemptuously as possible. The subject matter normally extends to one's parents and spouse as well as the participants personally.

On another occasion the accused and Kirk engaged in an argument. Apparently, the question of who was the father of the victim's child was at least partially responsible for the argument, for the accused had expressed doubts as to his being the father. Kirk and the accused were talking after the argument when the accused stated that there had been an argument ***861** between him and the victim and he hit her. The accused told Kirk that before he realized it, the victim was dead. He also said that he stabbed her.

Kirk stated that the accused told him the murder

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

occurred in the living room and that he put the body in the trunk of the car and took it to the Garden of The Gods Road and dumped it. The accused said he dumped the knife with which he stabbed the victim near a 7-Eleven store, and he carried the clothes the victim was wearing to a different spot. Kirk said the victim was wearing a thin night gown at the time.

Kirk related that the accused told him "To beat the case ... he wrote a note saying that Camille had left and all this here and got some other friend of his to say that him and Brian was together, you know, to make it look like that he didn't have nothing to do with it all."

He also stated that the accused expressed concern over what a young lady he was with would say to police. According to Kirk, the accused also worried about what a next door neighbor had seen or heard and whether he would testify, and whether he had gotten all the blood off the carpet, rugs, and stairs.

As a result of the accused's concern, Kirk asked two other inmates how blood could be removed without leaving detectable traces. Kirk said that the accused never indicated whether the steps "were up or downstairs," only his concern over whether he had successfully removed all of the blood. Kirk testified that the accused inquired of ways "to get rid of stuff that he had and was [the way he had done it] the smart way." He added that the accused also asked him "some bits about the law." The accused asked him about state law and how "he could beat it and all this here." Kirk related that "we got together and tried to help him as much as we could."

During Kirk's cross-examination, the defense homed in on some key inconsistencies. Prior to trial, and apparently prior to his going to Florida, Kirk had been interviewed by Detective Brown. At this interview Kirk claimed that the accused said he dumped the body by the Broadmoor. Kirk stated that at that point he was just telling Brown something to get rid of him because he did not think the accused would be tried after beating it at the state level.

Brown's Florida interview of Kirk was taped. The transcript of that interview reflects that when Brown asked about blood in the basement, Kirk never mentioned blood being on steps or the accused claiming to have found a note from the victim. Kirk explained the discrepancy by stating that Brown's tape recorder was turned off when he mentioned the blood on the steps. That was also his explanation for not having mentioned the note. He also stated that the note was mentioned in a conversation separate from the one where the accused admitted killing the victim. He admitted that he had collected newspapers both prior to and after the accused's arrival.

Kirk testified that it was hard to state a reason why he was testifying, but the agreement between him and state officials was not the real incentive. He stated that he did not want his son to suffer because he refused to testify. However, Kirk admitted that he plans to send for his son and his mother after he sets up a home in Florida.

Kirk insisted that he never approached anyone with his information. However, he must have told his attorneys, for he stated they attempted to use his information to his benefit when he told them to forget it. That was it until Detective Brown approached him. He said that Brown offered to drop his probation, but he just did not want to testify.

Now we will trace the investigators' trail to Kirk, for we believe it bears on his credibility. Detective Brown testified that he learned of Kirk through an inmate named Leipoldt. Brown contacted Kirk in Florida where he was residing. He stated that Kirk never approached him, and Kirk did not know he was coming to Florida to interview him. He said that Kirk never requested anything.

***862** Trial defense counsel's position was that Kirk had used newspaper clippings to fabricate his testimony so that he could work out a deal very much to his benefit. After testifying against the accused he would be a free man instead of facing a possible 8 years in addition to the three that were previously suspended. Thus, Kirk's interest or bias was obvious.

Kirk's testimony was sketchy. Additionally, the accused's carpet and living room rug tested negative for the presence of blood stains. It must be remembered, however, that Kirk claimed only to be relating what the accused told him, not necessarily *how* the murder occurred; *ergo,* it is certainly conceivable that the accused did not tell all that he knew or the precise details.

Only a couple of the newspaper articles pertaining to the case are attached as appellate exhibits, but they were written over one year after the victim's death. Consequently, we are unable to compare the content of Kirk's testimony with those of the articles.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

However, the defense's theory requires extreme shrewdness and patience on the part of Kirk. It also indicates a considerable gamble. It would assume that Kirk told his attorneys of the accused's admissions to him and then patiently waited for the system to come to him rather than his approaching investigators. This theory is negated by the fact that Detective Brown learned of Kirk's possible knowledge from Leipoldt, another inmate. Kirk, of course, could have worked the same method via Leipoldt. It would also indicate that Kirk played the role until the last possible instant, for the prosecution was not certain that he would testify until the evening before he appeared as a witness.

We find very interesting, Kirk's reference to the accused's concern over a young lady he was with. The only person to whom Kirk could be referring was Sgt Johnson. Johnson was a divorcee and a neighbor. She testified that the accused dropped by her quarters the afternoon of the victim's murder. During their conversation, she related some of her personal problems and the accused related some of his marital problems. The accused stated that he suspected the victim of infidelity. The next day, 14 June 1981, she telephoned for the victim and the accused answered. The accused said the victim was not home and he did not know where she was. The accused made no mention of a note from the victim. However, Kirk did not relate any details concerning the "young lady." We doubt that he learned of her via the newspaper.

We do not underestimate Mr. Kirk's shrewdness; and, as set forth above, his possible bias was obvious. However, applying our worldly experience, and realizing that the factfinders both saw and heard Mr. Kirk, we believe his testimony to have been credible.

[18] When Mr. Kirk's testimony is added to the wealth of circumstantial evidence establishing the accused's motive and opportunity to kill the victim, and the blood stains and their location, there is no other hypothesis but that of guilt. During closing argument, trial defense counsel brilliantly offered possible explanations for practically all of the victim's belongings being in the home and the accused's suspicious actions and inconsistent statements to his neighbors on the day of the victim's death, and afterwards. However, it would simply require far too many innocent coincidences to remove the aura of guilt from the accused's actions. As were the factfinders at the trial, we are also convinced beyond a reasonable doubt of the accused's guilt.

XI

We now turn to the contention that the accused was denied the effective assistance of counsel. [FN10] Appellate defense counsel have launched a broadside attack against the accused's trial defense counsel.

FN10. Appellate Government and Defense Counsel's Motions For Leave To File Affidavits are hereby GRANTED.

***863** The specific grounds stated in the assignment of error are as follows: (1) That trial defense counsel's pretrial preparation was totally inadequate as evidenced by their surprise over Kirk being called as a witness, and their failure to uncover false testimony by Mrs. Brice. Also part of this allegation is the alleged failure of trial defense counsel to communicate with a private investigator retained by the accused's initial civilian counsel; (2) That trial defense counsel's cross-examination of Kirk, and Dr. Bowerman was inadequate, and the absence of any cross-examination of Mrs. Brice; (3) The failure to call certain witnesses who could have provided exculpatory evidence; and (4) That trial defense counsel were basically deficient in ferreting out evidence which would have negated the prosecution's evidence against the accused.

We recently had occasion to review the latest tests to be applied when an accused claims that ineffective representation of counsel fall short of constitutional requirements. Quoting from *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we stated that to require reversal of a conviction or a death sentence, counsel's assistance must be defective in two essentials. They are:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes *both* showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. [Emphasis Added]

*United States v. Garcia,* 18 M.J. 716, 719

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

(A.F.C.M.R.1984). To make this determination, we must consider the totality of the evidence before the factfinder. *United States v. Garcia, supra.*

Trial defense counsel have responded to appellate defense counsel's contention in a detailed affidavit. They catalog their many efforts at obtaining the private investigator's report, including beseeching organizations such as the NAACP Legal Defense Fund for assistance. They relate that at one point they were able to obtain $500.00 due the accused in back Bachelor Allowance for Quarters, but the accused--at the last minute--refused to make any payment to the investigator. They also add that the accused expressly prohibited them from approaching his parents for financial assistance. These facts notwithstanding, however, trial defense counsel state: "Even though we never saw this report, we were convinced that our independent investigation had revealed all essential facts."

As regards Mr. Kirk, trial defense counsel advise that they interviewed him in the presence of his counsel on 15 December 1982, and that they also looked into his background. They insist they were fully prepared for his testimony. Trial defense counsel state they learned early on that another inmate could corroborate some of Kirk's testimony as well as recall independent admissions of the accused. Consequently, they "made a tactical decision to stay away from the accused's fellow inmates ... to avoid leading the prosecution to such potentially devastating evidence...." Trial defense counsel also deny receiving information from civilian appellate defense counsel about an alleged recantation of testimony by Kirk.

Trial defense counsel state that they determined at trial that the testimony of Mrs. Brice was unremarkable and had little impact on the case. They also advised that their pretrial preparation on the pathology aspect of the case was painstaking, including the issue of whether there was a struggle between the victim and her assailant. They concluded that there were no fingernail scrapings taken and that there was no credible evidence of a struggle.

***864** Trial defense counsel also detailed the civilian blood spatter pattern experts with whom they consulted prior to trial, including the FBI serologist who testified at trial. Their conclusion was that there was no reasonable basis on which to attack the test procedures employed by the FBI laboratory. Although trial defense counsel called Dr. Kier as a witness during the 39(a) session on motions, they did not call him during the defense case in chief because "he had not one scintilla of evidence ... which would have challenged Mr. Tubergen's conclusions." During oral argument, appellate defense counsel assailed trial defense counsel's decision not to attack the FBI serologist without first getting other expert opinion. This assertion appears rebutted by trial defense counsel's detailing of the experts with whom they consulted. We find it more than reasonable to infer that they based their tactical decision on the results of those interviews.

Trial defense counsel also state they were fully aware of the accused's and victim's bank records. They state they considered that evidence and discussed its evidentiary value with the accused at great length before concluding that the bank records did not substantially rebut the prosecution's evidence of the victim's intent to remain in the area until late June 1981.

On the sentencing portion of trial, counsel address the propriety of the accused not making an unsworn statement to the members. Trial defense counsel advise that the decision was left solely to the accused. They also state that "the value of other possible evidence was far outweighed by the rebuttal which we knew the government had ready."

Civilian appellate defense counsel have submitted an affidavit basically in response to trial defense counsel's affidavit wherein they dispute some of trial defense counsel's statements, *i.e.,* that there was, in fact, evidence of a struggle, and reasserting their claim that there was inadequate pretrial investigation. We will address these in more detail *infra* when we address the petition for new trial.

[19][20] It is axiomatic that an accused is entitled to be represented by effective counsel, and he is entitled to competent representation throughout the trial. *United States v. Jefferson,* 13 M.J. 1 (C.M.A.1982); *United States v. Rivas,* 3 M.J. 282 (C.M.A.1977). Another fundamental rule is that strategic or tactical decisions made by trial defense counsel will not be second guessed on appeal. *United States v. Rivas, supra.*

[21] The first thing which is apparent from reading the affidavit of trial defense counsel is that they were fully aware of the issues which appellate defense counsel aver should have been more vigorously

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

pursued. It is quite evident that trial defense counsel were faced with numerous tactical decisions throughout this trial. Their affidavit reflects that they made their decisions on various tactics only after weighing the potential impact and benefit to their client, the accused.

As is evident from the sections of this opinion *supra* as well as *infra,* trial defense counsel left no stone unturned via the numerous motions litigated on behalf of the accused during the 39(a) session on motions. Their motions were well conceived and were supported by written briefs. The briefs are concise and thorough, and present reasoned advocacy. In fact, trial defense counsel's oral advocacy during the trial turned what were patently open and shut matters into closely contested issues of law. This is especially so on the issues of the laboratory testing having consumed all but one of the suspected blood stains and the disposal of the accused's automobile.

During the trial on the merits, trial defense counsel's cross-examinations were designed to elicit and highlight the exculpatory aspects of the prosecution's evidence, thereby attempting to lessen the inculpatory inferences. As mentioned in Part X, *supra,* trial defense counsel's closing arguments were outstanding.

When the assignment of error is reduced to its essence, the gist of appellate defense ***865** counsel's averment is that they would have tried the case differently. This is an historical complaint. We reaffirmed a long standing rule in *United States v. Cohen,* 2 M.J. 350 (A.F.C.M.R.1976), *pet. denied,* 3 M.J. 88 (1977), where we stated as follows:

> ... Many records reflect examples of doubtful trial tactics but counsel cannot be censured [sic] for not adopting the best. It must be remembered that appellate counsel and this Court have the advantage of viewing the record after the findings and verdict, and when the decisions made in the conduct of the trial may be distorted by our lack of knowledge possessed by trial counsel. It is all too easy for a losing litigant to complain on appeal of too few conferences, failure to call witnesses, lack of cross-examination and other items too numerous to mention ... and too much cross-examination is often more damaging than too little.

*United States v. Cohen, supra* at 352, quoting from *United States v. Hunter,* 2 U.S.C.M.A. 37, 41, 6 C.M.R. 37, 41 (1952). The latest standards set forth in *United States v. Garcia, supra,* do not negate this principle. The fact that appellate defense counsel can show how the case may have been tried differently does not equate to ineffective representation at the trial level.

Our review of the record fails to support a finding that trial defense counsel's performance was deficient. *Strickland v. Washington; United States v. Jefferson; United States v. Rivas,* all *supra.* Accordingly we find this assignment of error to be without merit.

XII

We will dispose of the remaining assignments of error summarily.

[22] The accused asserts that the Challenge for Cause of Lt Col J should have been granted. This assignment of error is without merit. Trial defense counsel stated specifically that his challenge was based on Lt Col J not being candid in answering questions on his access to newspaper articles on the case. He interposed no disagreement with Lt Col J's ability to be impartial. Trial defense counsel declined the trial judge's invitation to recall Lt Col J for additional *voir dire.* The military judge did not abuse his discretion by refusing to rule that Lt Col J had willfully withheld information and by refusing the challenge. *United States v. Mason,* 16 M.J. 455 (C.M.A.1983); *United States v. Harris,* 13 M.J. 288 (C.M.A.1982); *United States v. Boyd,* 7 M.J. 282 (C.M.A.1982).

[23] Also asserted is that the search of the accused's vehicle should have been suppressed. This is also without merit. The evidence establishing the accused's voluntary consent is compelling. Part of the accused's alibi was that he had nothing to hide as evidenced by full cooperation with investigators. Additionally, the accused consented to the search of his automobile notwithstanding his First Sergeant advising him not to be so rash in waiving his rights. The search was clearly consensual. M.R.E. 314(e).

[24] Another assignment of error related to the automobile is that the disposal of the automobile by the El Paso County, Colorado Sheriff's Department rendered any evidence seized from it inadmissible. This is without merit. Investigators were emphatic that nothing of evidentiary value remained in the vehicle or it would have been retained. The accused had ample opportunity to reclaim possession of the automobile before it was disposed of. *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 80 L.Ed.2d 413 (1984).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

The military judge did not abuse his discretion by sustaining the objection to the testimony of Mr. H. The proffered testimony was not relevant to the issue of guilt or innocence. *See United States v. Ferguson,* 15 M.J. 12 (C.M.A.1983); M.R.E. 401, 402, 104(a).

[25] The military judge did not abuse his discretion by allowing the pathologist, Dr. B, to testify that in his opinion the stab wounds were consistent with the intentional infliction of injury. Dr. B had been ***866** properly qualified as an expert, M.R.E. 702, and there was a factual basis for his opinion. M.R.E. 703. Thus the testimony went to the issue of premeditation as well as aggravation. *United States v. Vickers,* 13 M.J. 403 (1982); *United States v. Woodyard,* 16 M.J. 715 (A.F.C.M.R.), *pet. denied,* 17 M.J. 204 (1983). The trial judge exercised his discretion with sensitivity, as evidenced by his ruling prohibiting Dr. B from stating the victim was tortured prior to her death. M.R.E. 403.

XIII

We now turn to the petition for new trial. Appellate defense counsel request a new trial on the basis of both newly discovered evidence and fraud upon the trial court. The proffered "new" evidence is as follows: A traffic citation purportedly issued to the victim with a notation that she was not wearing glasses; the opinion of an expert consulted after trial who is of the opinion that the blood spatter patterns on the stairs are inconsistent with the injuries suffered by the victim and that she did not die in the basement; that infrared photographs taken of the walls of the accused's quarters were negative for the presence of blood and that this exculpatory evidence was not disclosed to the defense; that financial records reflected that the victim controlled the family finances and that she had purchased furniture in May 1981 for delivery to her and the accused's quarters on the installation; that "tissue, skin and blood" under the fingernails of the victim indicate that she fought with her assailant, and that a physical examination of the accused did not reveal any scratches, etc.; and, information reflecting wrongdoing by Kirk other than that disclosed in open court.

[26][27][28] The test for whether a new trial will be granted on the basis of newly discovered evidence is well settled: The evidence must be newly discovered since trial, and it is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and, if considered by a court-martial in the light of all other pertinent evidence, it would probably produce a substantially more favorable result for the accused. M.C.M., para. 109*d*(2). The petitioner must also affirmatively show that an injustice resulted from the findings. *United States v. Bacon,* 12 M.J. 489 (1982), and cases cited therein. The burden on the petitioner is heavier than that normally borne during appellate review, and motions for new trial on the grounds of newly discovered evidence are not regarded with favor. Such motions should be granted only with great caution. *United States v. Bacon, supra.*

[29] Applying these criteria to the instant case, the accused fails to carry his burden. First, the traffic citation was clearly discoverable prior to trial. However, even if it were truly newly discovered, it would not produce a substantially more favorable result. By arguing the likelihood that the victim owned more than one pair of glasses, trial defense counsel vigorously attacked the significance of the victim's glasses being found in the master bedroom. Additionally, trial defense counsel used the presence of the glasses to support a rather weak theory of the victim being abducted from the home. Nonetheless, in view of practically *all* of the victim's possessions being in the home, including her purse and military identification card, we are convinced that this "new" evidence would not have changed the result at trial.

As regards the opinion of the blood spatter expert, again this is not new evidence. His opinions were known to trial defense counsel. Additionally, as pointed out in appellate government's brief, his opinion concurs with Detective Green on a very important point. His memorandum to appellate defense counsel states, "Some type of beating occurred directly in front of the staircase in the basement." He also agreed that the point of origin could be discerned from the spatters' directionality with accurate measurements. Under these circumstances, one cannot fault trial defense counsel for not calling him as a witness. ***867** We are convinced that this opinion would not produce a more favorable result.

We must reach the same conclusion on the infrared photographs. Trial defense counsel had access to all investigative files, etc., so, unless the taking of the photographs was not recorded, they should have known of their existence. However, this point need not detain us, for trial defense counsel used other evidence at trial to demonstrate that there was no evidence that the accused had painted over potentially incriminating blood stains. He did so via the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

testimony of Lt Duke who was in the home the afternoon of 13 June 1981. Lt Duke testified that he did not observe or smell any paint in the upstairs area of the accused's home. Additionally, during the cross-examination of Detective Green, trial defense counsel established that there were methods of detecting blood stains which had been painted over. This was stressed during closing argument when trial defense counsel reminded the members that a suspicious stain on an upstairs wall turned out to be a beverage similar to KoolAid.

As indicated in Part XI, *supra,* trial defense counsel were aware of the financial records and the autopsy report; therefore, these items are not newly discovered evidence. As for the autopsy report, it *does not* state that skin, etc., was taken from the victim. The report states that fingernail clippings were taken from the victim for laboratory analysis. The laboratory report reflects human blood stains on the fingernails, but not skin or tissue. Thus, this is not evidence of a struggle.

The last item of new evidence is additional evidence of wrongful conduct by Kirk. One of the offenses apparently occurred during the accused's trial, but the others were clearly discoverable prior to trial. At any rate, this "new" evidence pertaining to Kirk's credibility is not likely to have produced a more favorable result. The factfinders were clearly aware of Kirk's unsavory character, and we must infer that they weighed his testimony with great caution.

We conclude that the accused has not met his burden of producing new evidence which would produce a more favorable result. *United States v. Bacon, supra.*

[30] The accused also requests a new trial on the ground that fraud was perpetrated upon the court-martial via perjured testimony. He avers that Mrs. Brice and Kirk presented false testimony. We will first review the assertion on Mrs. Brice.

During her preliminary questions, Mrs. Brice stated her occupation was registered nurse. Appellate defense counsel has presented documentation which they contend shows that Mrs. Brice lied when she stated she was a registered nurse. The specific documentation is simply a private investigator's report that there is no record of Mrs. Brice ever being licensed in Colorado as a registered nurse.

Even where a fraud is perpetrated upon the trial court, it must have had a substantial contributing effect upon the findings in order to merit a new trial. M.C.M., para. 109*d*(3); *United States v. Bacon, supra.* Applying this standard, the allegation falls far short. First, the absence of a license in Colorado does not preclude her being licensed in another state. Second, it could be that Mrs. Brice had worked as a registered nurse at an earlier point of her life. Third, and most important, her occupation was irrelevant to her testimony, for she did not give medical testimony. Her testimony was that she was a friend and confidant of the victim; *ergo,* if the victim had been suffering from nosebleeds the victim would have told her. Their friendship would have motivated the revelation, not her occupation. At any rate, there was expert testimony that the blood stains/spatters were inconsistent with blood dripping from above, *i.e.,* a nosebleed. Therefore, even if Mrs. Brice is not, or never was, a registered nurse, that part of her testimony had no substantial contributing effect on the result.

[31] The main fraud alleged is that Kirk fabricated his testimony at trial and that he recanted his testimony after trial. ***868** As support, appellate defense counsel has submitted affidavits from a fellow inmate, David Lee, and Kirk.

Lee claims that the district attorney was putting pressure on Kirk to testify, so Kirk made up his testimony from newspaper clippings and from conversations "We had in El Paso County jail." Lee defines "we" as "We being Michael Kirk Brian Garries and myself David S. Lee."

Since Kirk does not recant his testimony, Lee's claim to the contrary presents a factual issue. We resolve the issue against the accused. Lee claims to have no knowledge of the accused's case, but yet he says that Kirk got his information, in part, from conversations with the accused at which he, Lee, was present. Secondly, although the conversations did not necessarily reveal incriminating statements, Lee's affidavit corroborates Kirk's claim that they discussed the accused's case. The only issue in dispute is the content of those conversations.

Contrary to appellate defense counsel's assertion, Kirk does not recant his testimony. The relevant portion of Kirk's post-trial affidavit reads as follows:

> [A]s far as my testimony in court was I told the truth, far as believing it I couldn't say I'm not a judge of people.

It requires a strained interpretation to conclude that the quoted portion equates to a recantation of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

testimony. All Kirk is saying, albeit inarticulately, is that he has no opinion as to whether the accused's revelations to him were true, for that was for others to decide; however, he testified truthfully and accurately *as to what the accused told him.*

In their affidavit, trial defense counsel stated they had reason to believe that another inmate, Leipoldt, could corroborate Kirk in addition to knowing of independent admissions by the accused. We are also mindful of the affidavit of the private investigator, Mr. Pubanz, who claims that Leipoldt disputed this assertion. Under these circumstances, the accused has not met his burden of showing that a fraud was perpetrated on the court via perjured testimony. *United States v. Bacon, supra; United States v. Morris,* 13 M.J. 666 (A.F.C.M.R.), *pet. denied,* 14 M.J. 446 (1982).

Additionally, the argument that Kirk had fabricated his testimony from newspaper clippings was fully presented to the factfinders for their consideration.

The last items of claimed fraud are that the investigation was slanted and fabricated to build a case against the accused rather than the actual perpetrator; and, that the court-martial was not presented with all of the available evidence. The latter contention is tied in with the assertion that trial defense counsel committed a fraud upon the court "in providing no defense to the charge." The evidence presented in support is an affidavit by a private investigator that Detective Green told him that he was concerned that the Sheriff's Department's investigation had not been done properly and was not thorough enough; that he was pulled out of the accused's residence prematurely; and, that certain witnesses had been pressured to testify.

[32] Detective Green's first alleged comment on the appropriateness of the investigation is subject to several interpretations. He may have been referring to the fact that following better procedures would have prevented the Colorado courts from suppressing the blood stain evidence. At any rate, he testified to the contrary on cross-examination. In response to trial defense counsel's questions, he stated that his investigation of the residence had been thorough, and that it was equally advantageous to exonerate a suspect, for they could then focus their efforts in other directions. Further, this information is similar to a recantation of testimony, and we must view it with disfavor. *United States v. Morris, supra.* Finally, it did not require much deductive reasoning to conclude that Kirk was persuaded to testify. His own testimony suggested as much.

As for the assertion that trial defense counsel perpetrated a fraud upon the court via ineptness, it does not merit comment.

***869** XIV

Accordingly, the findings of guilty and the sentence are

AFFIRMED.

XV

The Petition for New Trial having been fully considered, it is hereby

DENIED.

FORAY, Senior Judge, and O'HAIR, Judge, concur.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

U.S. Court of Military Appeals.

UNITED STATES, Appellee,
v.
Brian K. GARRIES, Airman First Class, U.S. Air Force, Appellant.

No. 51769/AF.
ACM 24158.

Aug. 4, 1986.

Accused, an airman first class in the United States Air Force, was convicted by general court-martial convened at the United States Air Force Academy, Jeffrey W. Cook, J., of the premeditated murder of his wife, and he appealed. The United States Air Force Court of Military Review, 19 M.J. 845, affirmed. Review was granted. The Court of Military Appeals, Cox, J., held that: (1) accused's request for $1,500 with which to obtain independent defense investigator was properly refused; (2) accused was not prejudiced in preparing his defense by lack of report of private investigator for which accused sought the $1,500 to pay for release; and (3) accused had not established that stains found in his on-base quarters and in his car possessed apparent exculpatory value before they were destroyed and were such that accused would be unable to obtain comparable evidence by other reasonably available means, so as to justify suppression of results of laboratory tests indicating stains were human blood, and that some of the stains were of murder victim's blood type.

Affirmed.

West Headnotes

[1] Military Justice 🔑1238.1
258Ak1238.1
(Formerly 258Ak1238)

Statute providing for adequate representation of defendants concerns representation of indigent defendants in federal district courts and is inapplicable to the military. 18 U.S.C.A. § 3006A.

[2] Military Justice 🔑1210.1
258Ak1210.1
(Formerly 258Ak1210)

Service members are entitled to investigative or other expert assistance when necessary for adequate defense, without regard to indigency, as matter of military due process. U.S.C.A. Const.Amends. 5, 14.

[3] Military Justice 🔑1210.1
258Ak1210.1
(Formerly 258Ak1210)

Usually, investigative, medical, and other expert services available in military are sufficient to permit defense to adequately prepare for military trial as required by due process. U.S.C.A. Const.Amends. 5, 14; UCMJ, Art. 46, 10 U.S.C.A. § 846; MCM 1969, par. 116; R.C.M. 703(d).

[4] Military Justice 🔑1210.1
258Ak1210.1
(Formerly 258Ak1210)

When accused applies for employment of expert in military justice proceeding, he must demonstrate necessity for the services. MCM 1969, par. 116; R.C.M. 703(d).

[5] Military Justice 🔑1210.1
258Ak1210.1
(Formerly 258Ak1210)

Accused's request for $1,500 with which to obtain independent defense investigator was properly refused by military judge, where accused had been provided with reports of investigation connected by civilian authorities, by Air Force Office of Special Investigations, and by appointed investigating officer, accused refused to make a showing of necessity for the funds on the record, instead requesting ex parte hearing, and proffered services of Air Force investigator who would work under order of confidentiality might have been viable alternative to requiring funding of private investigator. MCM 1969, par. 116; R.C.M. 703(d).

[6] Military Justice 🔑1210.1
258Ak1210.1
(Formerly 258Ak1210)

Military judge has inherent authority to permit use of ex parte proceedings in unusual circumstance in which it is necessary to insure fair trial.

[7] Military Justice 🔑1210.1
258Ak1210.1
(Formerly 258Ak1210)

Use of ex parte hearing to obtain expert services will rarely be appropriate in military context because funding must be provided by convening authority and such a procedure would deprive government of opportunity to consider and arrange alternatives for requested expert services. MCM 1969, par. 116; R.C.M. 703(d).

[8] Military Justice 🔑1426
258Ak1426

Accused was not prejudiced in preparing his defense in military trial by lack of investigative report which he unsuccessfully requested $1,500 to procure on ground that he wanted the funds to obtain an independent defense investigator, so as to entitle him to relief from conviction based on military judge's refusal of request for funds without first granting ex parte hearing requested by accused.

[9] Military Justice 🔑511.1
258Ak511.1
(Formerly 258Ak511)

State court ruling that results of laboratory tests performed on stains found in accused's on-base quarters and in his car should be suppressed under prevailing Colorado law because samples were destroyed in testing for prosecution without any measures being taken to permit accused's expert to be present or to verify the results did not bind government in military prosecution.

[10] Military Justice 🔑1262
258Ak1262

Constitutional and military due process duty to preserve evidence is limited to that which possesses exculpatory value that was apparent before it was destroyed and is of such a nature that accused would be unable to obtain comparable evidence by other reasonably available means. U.S.C.A. Const.Amends. 5, 14.

[11] Military Justice 🔑1262
258Ak1262

Accused had not established that stains found in his on-base quarters and in his car possessed apparent exculpatory value and were of such nature that accused would be unable to obtain comparable evidence by other reasonably available means, so as to justify suppression of results of laboratory tests indicating stains were human blood and identifying some of the stains to be of a type matching murder victim's, where there was no hint of bad faith on the part of the government, and accused had means available to attack test results through cross-examination, there was no indication that the stains were "apparently exculpatory" before they were consumed in testing or that preservation of the stains would have benefited defense, and testing had not been done by military or at its request.

[12] Military Justice 🔑1262
258Ak1262

Under U.C.M.J. article governing opportunity to obtain witnesses and other evidence, defense is entitled to equal access to all evidence in military justice proceeding, regardless of whether the evidence is apparently exculpatory. UCMJ, Art. 46, 10 U.S.C.A. § 846.

[13] Military Justice 🔑924
258Ak924

Better practice in military justice proceeding is to inform accused when testing may consume the only available samples and permit defense opportunity to have representative present. UCMJ, Art. 46, 10 U.S.C.A. § 846.

***289** For Appellant: *Luther C. West, Esq.* (argued); *Colonel Leo L. Sergi* and *Major Conrad C. Baldwin, Jr.* (on brief).

For Appellee: *Captain Joseph S. Kistler* (argued); *Colonel Kenneth R. Rengert* (on brief); *Colonel Andrew J. Adams, Jr.*, and *Major Robert E. Ferencik.*

Opinion of the Court

COX, Judge:

The nude body of appellant's pregnant wife, Airman First Class Camille Garries, was discovered on June 15, 1981, in a ditch located in Colorado Springs, Colorado. The victim was in the seventh month of her pregnancy--her death resulted in the asphyxiation of the female fetus. A first degree murder charge was filed against appellant in the El Paso County District Court. The trial court granted a motion to suppress test results of stains found in appellant's car and family quarters at the U.S. Air Force Academy, Colorado Springs. Upon interlocutory appeal by the prosecution, the trial court's ruling was affirmed by the Colorado Supreme Court. *People v. Garries,* 645 P.2d 1306 (Colo.1982). The ***290** prosecution then

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

filed a motion for an order of *Nolle Prosequi,* which was granted.

The military assumed investigation of the case and preferred a charge of premeditated murder. The Article 32, 10 U.S.C. § 832 [FN1] investigation was conducted on September 2 and 3, 1982. The charge was referred as capital and trial by general court-martial commenced on January 10, 1983.

FN1. Uniform Code of Military Justice, 10 U.S.C. § 832.

Contrary to his pleas, appellant was convicted by a panel of officer members of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918. The sentence to confinement for life, total forfeitures, reduction to E-1, and a dishonorable discharge was approved by the convening authority. The Court of Military Review affirmed. 19 M.J. 845 (1985).

This Court granted review of two issues:

I
WHETHER APPELLANT WAS IMPROPERLY DENIED INDEPENDENT INVESTIGATIVE ASSISTANCE.

Approximately 6 weeks before trial, detailed defense counsel made a written request to the convening authority for $1,500.00 with which to obtain an "independent defense investigator." This request was denied. At the first session of trial, the request for funding of a defense investigator was renewed. The military judge elicited from defense counsel that the defense had been provided with all the investigative reports prepared by civilian authorities, as well as the Air Force Office of Special Investigations (OSI) and the Article 32 Investigating Officer. Also, the defense had been offered the services of an Air Force investigator who would work under an order of confidentiality. The defense's refusal of this offer was reiterated at trial.

Defense counsel refused to particularize in open court the need for the requested sum of $1,500.00, asking for an *ex parte* hearing. The military judge denied the request for the $1,500.00, as well as the request for an *ex parte* hearing. The defense then requested a continuance of 3 months so appellant could save $1,500.00. This request was also denied.

Although the purpose was not revealed at trial, it became apparent after trial that defense counsel requested the $1,500.00 to pay for the release of an investigative report that had already been prepared by a private investigator hired by appellant's attorney in the state court proceedings. The defense did not know what the report contained until after trial, when the civilian attorney who represented appellant post-trial obtained the investigation.

[1] Appellant contends that the military judge erred in two respects: by ruling on his request for investigative assistance without first conducting an *ex parte* hearing as provided in 18 U.S.C. § 3006A(e) and by denying his request for investigative assistance. We disagree. The provisions of 18 U.S.C. § 3006A concern representation of indigent defendants in federal district courts and are inapplicable to the military. *United States v. Johnson,* 22 U.S.C.M.A. 424, 47 C.M.R. 402 (1973); *Hutson v. United States,* 19 U.S.C.M.A. 437, 42 C.M.R. 39 (1970).

[2][3] Nevertheless, as a matter of military due process, servicemembers are entitled to investigative or other expert assistance when necessary for an adequate defense, without regard to indigency. *Cf. United States v. Mustafá,* 22 M.J. 165 (C.M.A.1986) (accused entitled to access to qualified psychiatrist for purpose of presenting insanity defense); *United States v. Toledo,* 15 M.J. 255 (C.M.A.1983) (accused entitled to transcript of witness' prior testimony). Unlike the civilian defendant, however, the military accused has the resources of the Government at his disposal. *See* Art. 46, UCMJ, 10 U.S.C. § 846; para. 116, Manual for Courts-Martial, United States, 1969 (Revised edition); R.C.M. 703(d), Manual for Courts-Martial, United States, 1984. In the usual case, the ***291** investigative, medical, and other expert services available in the military are sufficient to permit the defense to adequately prepare for trial.

[4][5] When an accused applies for the employment of an expert, he must demonstrate the necessity for the services. *See Ake v. Oklahoma,* 470 U.S. 53, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *United States v. Johnson, supra;* para. 116, Manual, 1969, *supra;* R.C.M. 703(d). In this case, the defense refused to make a showing of necessity on the record. Furthermore, the offer to trial defense counsel of the services of an Air Force investigator who would work under an order of confidentiality may have been a viable alternative to requiring the convening authority to fund a private investigator. *Cf. United States v. Simmons,* 44 C.M.R. 804, 811 (A.C.M.R.1971), *pet.*

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

*denied,* 21 U.S.C.M.A. 628, 44 C.M.R. 940 (1972) (CID not obligated to investigate for defense); *Marshall v. United States,* 423 F.2d 1315, 1319 (10th Cir.1970) (designation of FBI to investigate for defense poses conflict-of- interest dilemma).

Appellant had been provided with the voluminous reports of investigation conducted by civilian authorities, by the OSI, and by the Article 32 Investigating Officer. Because appellant's request for funds to obtain investigative services did not explain why an investigator was needed, what the investigator would do, and why appellant's two detailed defense counsel and their staff could not perform any additional investigative work needed, the military judge did not abuse his discretion in denying the request. *See United States v. Goodwin,* 770 F.2d 631 (7th Cir.1985), *cert. denied,* 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986); *United States v. Davis,* 582 F.2d 947 (5th Cir.1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979); *United States v. Harris,* 542 F.2d 1283 (7th Cir.1976) ; *United States v. Mundt,* 508 F.2d 904 (10th Cir.1974), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975).

Appellant contends that the military judge's refusal to grant an *ex parte* hearing precluded him from establishing the necessity for independent investigative services without revealing defense tactics to the prosecution. [FN2] Even now, however, appellant's only explanation of why an investigator was necessary is the generalization that the case was referred as capital. It is apparent that the defense was not seeking further investigation, but payment for a report, contents unknown, that had already been prepared without prior authorization. In the absence of previous authorization for an expert, the Manual specifically provides that payment will be made for "ordinary witness fees" only. [FN3] Therefore, it is difficult to visualize how the defense would have benefited from imparting its true purpose for the $1,500.00 at an *ex parte* hearing.

FN2. An *ex parte* proceeding is one requested by one party without notice to or presence of the opposing party.

FN3. *See* para. 116, Manual for Courts-Martial, United States, 1969 (Revised edition); R.C.M. 703(d), Manual for Courts-Martial, United States, 1984.

[6][7] Although appellant has provided no authority for the use of *ex parte* proceedings in the military, we recognize inherent authority in the military judge to permit such a procedure in the unusual circumstance where it is necessary to insure a fair trial. By its very nature, however, an *ex parte* proceeding may provide undue advantage to one party. *Cf. United States v. Wilkerson,* 1 M.J. 56, 57 n. 1 (C.M.A.1975). Use of an *ex parte* hearing to obtain expert services would rarely be appropriate in the military context because funding must be provided by the convening authority and such a procedure would deprive the Government of the opportunity to consider and arrange alternatives for the requested expert services. *See United States v. Vietor,* 10 M.J. 69, 77-78 (C.M.A.1980) (Everett, C.J., concurring in the result).

[8] In any event, the sought-after investigative report was obtained after trial and discussed in the petition for new trial and ***292** in allegations of ineffective assistance of counsel. We are convinced that appellant was not prejudiced in preparing his defense by the lack of this report.

II
WHETHER THE MILITARY JUDGE ERRED BY FAILING TO GRANT THE DEFENSE MOTION TO
SUPPRESS BLOOD STAIN EVIDENCE WHICH WAS CONSUMED BY THE GOVERNMENT IN TESTING
BEFORE TRIAL WITHOUT ANY PROCEDURAL SAFEGUARDS TO INSURE INDEPENDENT DEFENSE
TESTING OR VERIFICATION.

At his court-martial, as he did at his trial in state court, appellant sought to suppress results of laboratory tests performed on stains found in his on-base quarters and in his car. The stains were consumed in routine testing conducted at the Federal Bureau of Investigation (FBI) laboratory. Mr. Roy Tubergen, the forensic serologist who performed the testing, testified that one trunk liner was stained with human blood, identified as type B, enzyme PGM 2-1. [FN4] The other stains were also found to be human blood, but the stains were of insufficient size to permit grouping by blood type.

FN4. The victim had group B, enzyme type PGM 2-1 blood.

[9] Under prevailing Colorado law, the evidence was ruled inadmissible because the samples were destroyed in testing for the prosecution without any

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

measures being taken to permit appellant's expert to be present or to verify the results. 645 P.2d at 1308. That state court ruling does not bind the Government in this case because the United States was not a party to that proceeding. *Cf. United States v. Fuentes,* 18 M.J. 41, 51 (C.M.A.1984) (findings in one trial not binding in another where parties are different).

[10] We believe this case is controlled by *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), made applicable to the military by *United States v. Kern,* 22 M.J. 49 (C.M.A.1986). In *Trombetta,* the Supreme Court held that breath-analysis tests are admissible in criminal trials even though the state fails to preserve the breath samples of suspected drunk drivers for independent defense testing. The constitutional and military-due-process duty to preserve evidence is limited to that which, (1) "possess[es] an exculpatory value that was apparent before" it "was destroyed, and" (2) is "of such a nature that the" accused "would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489, 104 S.Ct. at 2534; 22 M.J. at 51. The accused has the burden of showing that evidence which "is not 'apparently exculpatory' " was of "an exculpatory value that was or should have been apparent to the Government before it was ... destroyed and" that "comparable evidence" is unavailable. *United States v. Kern, supra* at 51-52. Appellant has not met that burden here.

[11] First, as in *Trombetta,* there was no hint of bad faith on the part of the Government. In fact, the military judge found no evidence of negligence, bad faith, or misconduct on the part of the laboratory personnel. Second, appellant had other means available to attack the test results. The forensic serologist who conducted the tests testified and was available for full cross-examination. The defense was free to challenge the test results by attacking the reliability of the testing procedures and the competence and credibility of the testing official through cross-examination and through testimony of its own expert. Finally, there is no indication that the stains were "apparently exculpatory" before they were consumed in testing or that preservation of the stains would have benefited the defense. [FN5] The defense expert conceded the ***293** scientific validity of the tests and did not challenge the decision to conduct these tests rather than others.

FN5. Prosecution exhibit 8, one of the stair treads, was found to contain "human blood" with "inconclusive" group B indications by the FBI testing. At the time of trial, still remaining on the exhibit were several "very suspicious" stains which the defense expert testified would lead him to test further "for the presence of blood." Although this exhibit was available for further testing, the defense apparently did not have it tested by its expert. Thus, it appears that appellant may not have been totally deprived of the opportunity for independent testing.

[12][13] Under Article 46, the defense is entitled to equal access to all evidence, whether or not it is apparently exculpatory. *United States v. Kern, supra.* Thus, the better practice is to inform the accused when testing may consume the only available samples and permit the defense an opportunity to have a representative present. Under the circumstances of this case, however, we find no prejudice. [FN6] Art. 59(a), UCMJ, 10 U.S.C. § 859(a).

FN6. If the testing had been done by the military or at its request, a different result might be required. In that situation, it would be difficult to excuse the failure to provide notice to the defense.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT concurs.

Judge SULLIVAN did not participate.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Supreme Court of the United States

Brian K. GARRIES, petitioner,
v.
UNITED STATES

No. 86-501

December 1, 1986

Case below, 19 M.J. 845; 22 M.J. 288.

Petition for writ of certiorari to the United States Court of Military Appeals.

Denied.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Only the Westlaw citation is currently available.

U.S. Air Force Court of Military Review.

Pharaoh Ojore NKOSI, a.k.a. Brian K. **Garries,** Petitioner
v.
Colonel Gregory LOWE and the United States of America, Respondent

No. **94-03.**

April 29, 1994.

Before HEIMBURG, PEARSON, and SCHREIER, Appellate Military Judges.

PER CURIAM:

***1** Petitioner seeks extraordinary relief in the form of a writ of error coram nobis ordering that his general court-martial conviction for premeditated murder be reviewed anew under Article 66, UCMJ, because his appellate counsel violated his right to effective representation. He previously exhausted his appeal rights. *United States v. Garries,* 19 M.J. 845 (A.F.C.M.R.1985), aff'd., 22 M.J. 288 (C.M.A.), *cert. denied,* 479 U.S. 985 (1986). This Court's opinion also denied his petition for a new trial. 19 M.J. at 866- 69. He is presently incarcerated at the United States Disciplinary Barracks, Fort Leavenworth, Kansas. Although this Court has the authority to act on this petition, *see* 28 U.S.C. § 1651(a) (1988), *see also Tillman v. United States,* 32 M.J. 962 (A.C.M.R.1991), we find that the requested relief is unwarranted.

Petitioner argues that his first set of appellate counsel, who filed his appeal with this Court, provided ineffective representation when they moved to file certain affidavits and documents in support of his petition for new trial. Petitioner claims these submissions "create[d] a cloud of guilt and culpability" that tended to prove the prosecution's case against him. He also argues his second set of appellate counsel, who filed his appeal with the Court of Military Appeals, were ineffective because they didn't assert that his first set of appellate counsel were ineffective when they submitted the affidavits and documents.

A meritorious claim of ineffectiveness of counsel must establish that (1) the factual allegations are true, (2) the counsel's performance fell below an objective standard of reasonableness, and (3) there is a reasonable probability that, but for the counsel's deficient performance, the result would have been different. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Tharpe,* 38 M.J. 8 (C.M.A.1993); *United States v. Polk,* 32 M.J. 150 (C.M.A.1991); *United States v. Scott,* 24 M.J. 186 (C.M.A.1987).

We accept petitioner's factual allegations as true-his first set of appellate counsel did file the questioned documents and his second set of appellate counsel did not assert ineffective assistance of appellate counsel. However, we find the performance of counsel in both cases was reasonable. Petitioner's first set of appellate counsel made an able effort to establish grounds for a new trial and raise doubt about critical trial testimony by filing the documents in question. Comparing the content of the documents with the evidence contained in the record of trial, we find counsel acted reasonably and appropriately. Having found the submission of the documents to have been reasonable, we clearly believe the failure of petitioner's second set of counsel to assert ineffective assistance of appellate counsel was clearly within an objective standard of reasonableness. Accordingly, the petition is

DENIED.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

UNITED STATES COURT OF MILITARY APPEALS
Daily Journal

Thursday, June 9, 1994

94-166

APPEALS--SUMMARY DISPOSITIONS

No. 93-5009/AF. U.S. v. Ross M. Ketelboeter. CMR 29608. On further consideration of the certified question (37 MJ 270) we conclude that the United States Air Force Court of Military Review did not err as a matter of law in granting appellee an additional four days credit for unreviewed pretrial confinement based on *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). *See United States v. Rexroat,* 38 MJ 292 (CMA 1993). Although appellee's failure to seek such credit at trial may have waived his entitlement to additional credit as a matter of law, *see United States v. McCants,* 39 MJ 91 (CMA 1994), the court below acted within its broad power to determine that sentence relief was appropriate even though not legally required. Article 66(c), Uniform Code of Military Justice, 10 USC § 866(c). Accordingly, it is ordered that the certified question is answered in the negative; and that the decision of the United States Air Force Court of Military Review is affirmed.

SULLIVAN, Chief Judge (concurring in the result):

I respectfully concur in the result here. I would allow the four day credit, in part, on the basis of judicial economy.

ORDERS GRANTING PETITION FOR REVIEW

No. 94-0472/MC. U.S. v. Johnny R. Gobble. CMR 92-0060.

No. 94-0645/NA. U.S. v. Scott A. Boutin. CMR 93-1157.

No. 94-0661/MC. U.S. v. Brent D. Waggy. CMR 9202602.

In each of the above cases, appellant's petition for grant of review is granted on the following issue raised by appellate defense counsel:

The Judge Advocate General of the Navy's preparation of the Navy-Marine Corps Court of Military Review judges' fitness reports deprives that court of its independence and the appearance of independence?

No. 94-0483/NA. U.S. v. Richard V. Eckgren. CMR 93-0717. Granted on Issue V raised by appellate defense counsel as follows:

Does the involvement of the Assistant Judge Advocate General for Military Justice and the Judge Advocate General of the Navy in the preparation of the Navy-Marine Corps Court of Military Review judges' fitness reports deprive the court of its independence and the appearance of independence?

PETITIONS FOR GRANT OF REVIEW--OTHER SUMMARY DISPOSITIONS

No. 94-0853/NA. U.S. v. Michael R. Andrews. CMR 85-4629. Appellant's motion to extend time to file supplement to petition for grant of review denied; appellee's motion to dismiss granted.

No. 94-0884/AR. U.S. v. Albert L. Cooper. CMR 9301481. Appellant's motion to withdraw petition for grant of review granted.

PETITIONS FOR GRANT OF REVIEW FILED

No. 94-1060/AR. U.S. v. Tracy B. Spruell. CMR 9301165.

No. 94-1061/AR. U.S. v. Sy F. Koppen. CMR 9301239.

No. 94-1062/MC. U.S. v. Mario J. Bernie. CMR 93-1726.

MISCELLANEOUS DOCKET--SUMMARY DISPOSITIONS

Misc. No. 94-8108/AR. Edgar R. Hunt, II, appellant, v. Colonel Gregory Lowe and the United States, appellees. Misc. CMR 9400113. Writ appeal petition for review of the United States Army Court of Military Review's denial of a petition for extraordinary relief denied.

Misc. No. **94-8109**/AF. Pharaoh O. **Nkosi**, appellant, v. Gregory Lowe (Commandant), USAF, and the United States, appellees. Writ appeal petition for review of the United States Air Force Court of Military Review's denial of a petition for extraordinary relief denied.

INTERLOCUTORY ORDERS

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

No. 93-0868/AR. U.S. v. Robert R. Ingham. CMR 9002347. Appellant's motion to admit defense appellate exhibit granted.

No. 93-1283/MC. U.S. v. Keith M. Henry. CMR 92-0042. Appellant's motion to substitute appellant's original signature page to appellant's brief granted.

No. 94-0040/NA. U.S. v. Lawson H. Gober. CMR 91-01225. Appellant's motion to extend time to file final brief granted to July 11, 1994.

No. 94-0652/AR. U.S. v. Robert L. Geren. CMR 9201836. Appellant's motion to extend time to file supplement to petition for grant of review granted to July 6, 1994.

No. 94-0720/NA. U.S. v. Antonio Ruiz. CMR 93-0778. Appellant's motion to attach document granted.

No. 94-0796/AR. U.S. v. Stephen E. Boone. CMR 9200231. Appellant's motion to extend time to file supplement to petition for grant of review granted to June 27, 1994.

No. 94-0903/NA. U.S. v. Gerald R. Hawthorne. CMR 92-02493. Appellant's motion to attach document denied.

No. 94-0945/AF. U.S. v. Steven D. Troutman. CMR 30288. Appellant's motion to extend time to file supplement to petition for grant of review granted to July 8, 1994.

No. 94-0948/AF. U.S. v. Curtis McNeil. CMR S28701. Appellant's motion to extend time to file supplement to petition for grant of review granted to July 8, 1994.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRIAN K. GARRIES, a/k/a, Pharaoh O. Nkosi,** | : | |
| **Petitioner** | : | |
| | : | |
| **v.** | : | **Civil No. 1:CV-01-1119** |
| | : | **(Kane, J.)** |
| **DONALD ROMINE, Warden,** | : | |
| **Respondent** | : | |

**CERTIFICATE OF SERVICE BY MAIL**

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on September 5, 2001, she served a copy of

**GOVERNMENT'S RESPONSE TO**
**THE PETITION FOR WRIT OF HABEAS CORPUS**

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Harrisburg, Pennsylvania.

Addressee:

Brian K. Garries
Reg. No. 11388-045
USP Pollack
P.O. Box 2099
Pollack, LA 71467

SHELLEY L. GRANT
Paralegal Specialist