Pharaoh O. Nkosi
#11388-045
USP/POLLOCK
P.O. BOX 2099
POLLOCK, LA
    71467-2099

**ORIGINAL**

**FILED
HARRISBURG**

OCT 2 5 2001

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION

| | | |
|---|---|---|
| BRIAN K. GARRIES, a/k/a, | § | |
| Pharaoh O. Nkosi, | § | |
| Petitioner | § | CIVIL No. 1:CV-01-1119 |
| V. | § | |
| DONALD ROMINE, Warden, | § | (Judge Kane, J.) |
| Respondent | § | |

PETITIONER REPLY TO  GOVERNMENT'S RESPONSE
TO WRIT OF HABEAS PURSUANT TO § 2241

COMES NOW BRIAN K. GARRIES, a/k/a Pharaoh O. Nkosi, and respectfully files his reply to the government's response to the writ of habeas corpus filed in the aboved named and numbered civil action.

For the following reasons this honorable court should review petitioner's pleadings  where he did not receive a full and fair hearing before the military tribunal.

THE MILITARY TRIBUNAL DENIED PETITIONER GARRIE'S A FULL AND FAIR HEARING ON THE MERIT'S RAISED IN HIS PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

**Standard of Review:**

In habeas corpus proceedings instituted by a military prisoner, a federal district court must hold an evidentiary hearing if the petitioner did not receive a full and fair hearing in a military court, either at the trial or in a collaterial proceeding. Townsend V. Sain, 372 U.S. 293, 9 L.Ed.2d 770, 83 S.Ct. 745 (1963).

**ARGUMENT**

In the instant case the material facts were not adequately addressed in the military court proceedings, nor did the tries of fac afford petitioner a full and fair hearing on the merit's and allegations alleged in his habeas petition, where the Court only stated that the "claim's as presented were without merit, thus, the denial was merely a ruling that petitioner's pleadings were deficient and not a ruling on the factual merit's of the claims persented. See Sanders V. United States, 373 U.S. at 19, 83 S.Ct. at 1079 (1963).

This Court on July 18,2001, issued an order directing the respondent to address the allegations in petitioner's habeas corpus. See govt. at 1. However, the government in it's response did not address the allegations of petitioner's pleadings, instead the government argues that petitioner's pleadings should be dismissed because the military tribunal had given petitioner a full and fair hearing on the merits of his pleadings. See govt. at 2.

At pages 5-8, of petitioner's writ of habeas corpus, petitioner has alleged that his appellate counsel denied him effective assistance of counsel by submitting the affidavits of Michael J. Kirk and David Scott Lee on his appeal, where such affidavits were not new evidence as required for a motion for new trial, and that

2.

such affidavit's corroborated the government's case against him. Petitioner alleges that had his counsel presented the affidavit of JEFFERY H.H. PUBANG, as being new evidence in the motion for new trial, there is a reasonable probability that the court would have at least granted petitioner a evidentiary hearing to determine if such evidence was in fact new evidence that had not being known during the course of trial or before trial. See attached affadivit.

In <u>Townsend V. Sain</u>, 372 U.S. 293, 372-13, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963), the Supreme Court explained the following:

> That a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances. (1) If the merit's of the factual dispute were not resolved
> in a lower court hearing, (2) the lower Court's factual determination is not fairly supported by the record, (3) fact finding procedures employed by the lower court was not adequate to afford a full and fair hearing, (4) there is a substantial allegation of newly discovered evidence (5) material fact's were not adequately developed (6) reasons
> appear in the record that trier of fact did not afford petitioner a full and fair hearing. Id at 313, 83 S.Ct. at 757.

In the instant case petitioner did not receive a full and fair hearing before the military tribunal on the allegations raised on appeal and in his habeas petition, such as the military appeal court did not address the affidavit submitted by counsel as to Jeffery H.H. Pubang, that would have supported a motion for new trial , nor did the court fully address other issues of merit, such as the court finding that it was nor bound by the Colorado state Court's findings, but never ruling that the Colorado state Court ruling was in error.

3.

This Court has the authority to set aside the findings of the military tribunal if it finds that such decisions by the military Court were decided clearly erroneous.  See <u>Sullivan V. Cuyler</u>, 723 F.2d 1077 (3d Cir.1983).

## UNEXHAUSTED ISSUES:

Petitioner has submitted issued that were raised in the military court's and unexhausted issues never raised in his supplemental brief never raised before the military court of review. Therefore, petitioner's federal habeas is a mixed petition as defined in <u>Rose V. Lundy</u>, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), <u>Slotnick V. O.lone</u>, 683 F.2d 60 (3d Cir. 1982), therefore this Court should follow the ruling in Rose V. Lundy, and in <u>Dooley V. Petsock</u>, 816 F.2d 885 (3rd Cir.1978); <u>Landano V. Rafferty</u>, 897 F.2d 661 (3rd Cir.1990)(Petitioner had to exhaust remedies in lower court with respect to additional claims raised in motion for relief from judgment).

This Court in the interest of justice should address each of petitioner's claims for relief and find in favor of petitioner and grant the relief prayed for in the interest of justice.

## Conclusion.

Based on the aforesaid arguments and case citation and petitioner's original pleadings this court should in the interest of justice grant the relief prayed for.

Respectfully Submitted,

*[signature]*

Certified Return Receipt 7001 1940 0006 8906 8951

<u>A F F I D A V I T</u>

I, Jeffrey H.H. Pubanz, being duly sworn, depose and state as follows:

1. That I have read the affidavit of LTC Byassee and Major Thomas filed in response to my affidavit and that of Mr. Borchers. I believe that certain allegations in that affidavit are incorrect. I have had related to me information concerning the Government response to the Petition for New Trial and Brief.

2. That I have examined the autopsy prepared during the investigation of this case. One of the cuts on Camille Garries' hand was defensive, as noted in the autopsy and police report. When coupled with other information, this is a clear indication that she struggled in an attempt to save her life. Her assailant would have been scratched and bruised. The records secured from the Colorado State Hospital indicate that Brian Garries was not bruised or scratched.

3. That I personally told LTC Byassee and Major Thomas that I had located a blood spatter expert, Walter Kent Moeller, who was willing to travel to Colorado Springs to talk with them. I have read their affidavit and it is not correct. I told them of Mr. Moeller prior to trial, and then notified them again when Moeller had finished his analysis and report.

4. That I have no idea from where LTC Byassee and Major Thomas came up with their information concerning Chad Leipoldt. I further have been advised that Government Appellate Counsel claims in his brief that I did not talk with Mr. Leipoldt. Attached is a transcription of my inview with him. This took place on June 21, 1983. Mr. Leipoldt never heard Brian Garries say that he killed his wife. On the contrary, he repeatedly denied it. He also indicated that Kirk claimed to have taken automatic weapons from the Army, and he did not believe him.

5. That the bank records indicate that Camille Garries purchased over $1,000 worth of furniture the last month of her life. This completely contradicts the claim that she was returning to Georgia. Further, she was totally in control of the money.

6. That infra-red and ultra violet photographs were taken of the entire house, including the basement. This can clearly be seen from the photographs attached to my affidavit. I was informed that these pictures reflect no blood in the entire house, including the basement. I was told the the pictures did exist and had developed properly, but was denied them later when I requested to see them.

Jeffrey H.H. Pubanz

STATE OF COLORADO    )
                     )  ss:
County of Adams      )

      SUBCSRIBED AND SWORN to before me this 13th day of October, 1984 by Jeffrey H.H. Pubanz.

                    _Barbara K. Baines_
                    Notary Public
                    7907 Zenobia Street
                    Westminster, Colorado 80030

My commission expires:

BARBARA J. BAINES
NOTARY PUBLIC
7907 ZENOBIA ST.
WESTMINSTER, CO 80030

MY COMMISSION EXPIRES:
MARCH 2, 1986

<u>CERTIFICATE OF SERVICE</u>

I  Pharaoh O. Nkosi, petitioner do hereby certify that on this the ⎯⎯ ,day of October, 2001, that I have served a true and correct copy of the foregoing instrument's, by mailing, postage prepaid, to the following:

SHELLY L. GRANT  &  MARTIN C. CARLSON
AUSA
FEDERAL BLDG , SUITE 220
P.O. BOX 11754
228 WALNUT STREET
HARRISBURG, PA 17108-1754

1  DELTA CORRECTIONAL FACILITY, DELTA, COLORADO

2  ————————————————————————————————————————————

3  TRANSCRIPT OF A TAPE RECORDED INTERVIEW

4  ————————————————————————————————————————————

5  Interview Between

6  JEFF PUBANZ,

7  Investigator,

8  And

9  CHAD LEIPOLDT,

10  Inmate.

11  ————————————————————————————————————————————

12          The interview in this matter commenced on the 21st day

13  of June, 1983.

14

15

16

17

18

19

20

21

22

23

24

25

1   (The following interview was held on the 21st day of

2 June, 1983.)

3   MR. PUBANZ:  Okay.  To begin with, my name is Jeff

4 Pubanz.  I'm investigating the Brian Gareis murder case.  Your

5 name came up in it.  And because it came up with it, we thought

6 it would be best to talk to you and tell you what we heard about

7 it as far as your involvement in this thing, see what you can

8 tell us about it, either confirm it, or disconfirm it, whatever

9 you want to do, so that I've got all of the information on this.

10   To begin with, the original case against Brian Garies

11 stuck.  We know that most of the information that went against

12 him in court was fabricated.  I got done talking to Michael Kirk

13 in Ft. Lauderdale, Florida, day before yesterday.  I've got his

14 affidavit where he stated that the entire context of his conver-

15 sation with Brown was fabricated.  It was fabricated for the

16 point of getting the police department In Colorado Springs off

17 his back, to get Probation off his back, and to get the courts

18 off his back.  He was basically coerced into coming back to Colo-

19 rado, according to him.  During the course of the interview your

20 name came up.

21   MR. LEIPOLDT:  For what?

22   MR. PUBANZ:  Well, that's what we were going to find

23 out.

24   /

25   /

1                          CHAD LEIPOLDT

2    was questioned and answered as follows:

3    BY MR. PUBANZ:

4        Q    My understanding is you were endorsed as a witness

5    during the civil trial.  Am I correct?

6        A    They wanted me to, but --

7        Q    Okay, can you tell me who approached you on that?

8        A    Ah, some sheriff's investigator.

9        Q    Does the name Ishamer Brown ring a bell to you?

10       A    Isham.

11       Q    Isham?  Okay, do you recall when they approached you?

12       A    It was back in April.

13       Q    Okay, what did they ask you?

14       A    Ah, they just wanted to know what had happened as far

15   we knew.  Me and Kirk was ward reps at the time.

16       Q    Mm-hm.

17       A    And Garies and, I guess, Kirk had a discussion.  Kirk

18   came back to me, and was rappin' his mouth about that.

19       Q    Okay.  What can you tell me about it?

20       A    Not really a whole lot.  All I know is what Kirk said

21   and he said that Brian had told him that he'd (inaudible) lady

22   and threw her in the trunk of the car.

23       Q    Okay.  He didn't mention anything at all about her be

24   bludgeoned?

25       A    Stabbed.

1    Q   Just stabbed.  Okay.

2    A   That's all I know.

3    Q   Obviously you didn't testify.  Am I correct?

4    A   Nooo.

5    Q   Okay.  Did you ever hear Brian state anything at all

6 about killing his wife?

7    A   Nope.

8    Q   Did you overhear anything, other than through Kirk?

9    A   I didn't pay no attention.  When we was ward reps we h

10 a, what you might call a standing pact.  People weren't suppose

11 to talk about their cases in that ward.

12    Q   Okay.  Kirk was keeping a file of all the newspaper

13 clippings.  To your knowledge did he keep any records of anybod

14 else, other than Brian?

15    A   He kept all kinds of people's.  All kinds of people's.

16 Mine, his, Brian's.

17    Q   Okay.

18    A   As far as I know.

19    Q   Did Kirk ever tell you that he was going to make a dea

20 with the jurisdictions at all?

21    A   No.  I was already on my way to prison when all that

22 happened.

23    Q   Okay.  Did anybody approach you to give you a deal, of

24 any kind?

25    A   No.

1     Q   What's your opinion of Kirk?

2     A   Really no opinion.  We just spent some time in the jai

3 together.

4     Q   Okay, did you ever have any problems with him?  Any

5 fights of any kind?

6     A   We had a, when I first got to jail, you know, me and

7 some blacks had it out in there. but, ah, after that things was

8 cool.

9     Q   Okay, did you ever have any problems with Brian?

10    A   Nope.

11    Q   Okay.  Did Kirk ever discuss to you about his stealing

12 federal arms?  Theft of arms off of Fort Carson?

13    A   Yeah.

14    Q   What did he tell you about it?

15    A   He just said he'd been busted with some M-16's in his

16 trunk.  (Inaudible) on himself.

17    Q   Did he say where he was busted at?

18    A   No.

19    Q   Okay.  What's your background?  Do you come from the

20 Springs?

21    A   Yeah.

22    Q   Have you lived there most of your life?

23    A   Yeah.

24    Q   Okay.  I'm going to show you this list of names.  I'd

25 like you to tell me if you know any of those people.

1    A   Okay, one.

2    Q   Okay.  I understand you have a little Klan background,

3  do you?

4    A   Little bit.

5    Q   Were you any part of that group that got busted in the

6  Springs?

7    A   No.

8    Q   Okay, you've had no association with the Black Muslims

9  that were in the Springs?

10    A   No.

11    Q   Okay.  Getting back to Kirk.  Did he at any time ever

12  tell you that he was fabricating the story?

13    Q   No.  I just take them jail house stories in one ear and

14  out the other.

15    Q   All right, well it's important.  There's a man sitting

16  in federal prison right now for his life, because of the testi-

17  mony of Mr. Kirk.  I got hired on this case to find out what hap-

18  pened.  His military trial was an absolute fiasco.  I'm now into

19  this to try and find out what happened and where the credibility

20  of the witnesses are.  So anything --

21    A   Yeah, I was (inaudible) that from Centennial.

22    Q   And anything he might have told you becomes very impor-

23  tant.  Now, the statement that he gave us, he implicated you as

24  being an instigator as far as far as trying to set up some kind

25  of a deal with the authorities to get your time broken.

1    A   No, they had approached me and asked me what I knew

2  about it.    I told 'em, "I'm not the guy to talk to.  I don't

3  know anything about it."

4    Q   Okay.  Did Kirk ever approach you and tell you that th

5  did the same thing with him?

6    A   No, he was gone at that time.  You know, I was sittin

7  there waiting sentencing.

8    Q   Okay.  All right, what were you convicted of?

9    A   Second degree kidnapping.

10    Q   Okay.  And how long's your sentence?

11    A   Ah, six years.

12    Q   Okay.  When's your projected parole date?

13    A   May 18th.

14    Q   This year?

15    A   Comin' up.  '84.

16    Q   Okay.  Okay.  While you were in custody, do you recall

17  Timothy Battles?

18    A   No.

19    Q   Okay, how about Justin Logan?

20    A   Name rings a bell, but I don't --

21    Q   Okay.  How close of a relationship did you have with

22  Brian?

23    A   Not really much of a relationship at all.  He'd come

24  back and talk about his cookin' food for his girl friends and

25  Alabama and shit.

1    Q   Okay.  Did he ever admit to you that he killed his wife

2  or did he ever deny to you that he killed his wife?

3    A   He denied it, a lot.

4    Q   Did he do this once?  Twice?

5    A   Lots of times.

6    Q   Okay.  Lots of times, how often?

7    A   Like when he'd go to court, you know.  And when he was

8  troubled.

9    Q   Okay, so the entire time that you knew him he totally

10 disaffirmed having anything to do with his wife's killing.

11   A   Yeah.  And that night Kirk came up to me, you know, and

12 was sayin', "Hey, he did this and he did that," you know, that

13 was just in one ear and out the other.

14   Q   Okay.

15   A   When Isham came up and confronted me, they wanted to

16 know what I knew, and I sent 'em to Kirk, and they asked why I

17 sent 'em to Kirk, 'cause I told 'em, "Hey, this guy told me a

18 story one time," and I told them the story he told me.

19   Q   All right, what did you tell 'em that Kirk had told you?

20   A   Ah, Kirk just came up to me one night and said that

21 Brian had told him his old lady was screwin' around on him, and

22 he got mad and did a number to her.  And he tried coverin' up his

23 tracks.  There was one incident where he said that he threw a

24 knife, or something away in a trash can and the cops were watch-

25 ing and he was always worried about that.

1     Q   Okay.

2     A   You know, I don't know if it was a knife, or hash, or --

3     Q   Okay.  This is what Kirk said, not what Brian had said.

4  This was related to you through Kirk.

5     A   Mm-hm.

6     Q   Okay.  Did Kirk ever tell you where he lived at in the

7  Springs?

8     A   No.

9     Q   Okay.  Did Kirk ever bring this up to you other than the

10  one time?

11     A   No.

12     Q   It was only a one time thing.

13     A   Yeah.

14     Q   Did he ever talk to you at all about whether his charges

15  would be reduced if he testified?

16     A   No.

17     Q   Okay.

18     A   When we was in jail together, that was like in July and

19  October of '81.  And when they approached me it was clean into

20  April of '82, about then.

21     Q   Right, you were a last minute witness for 'em.  Okay.

22  Did Kirk ever talk to you about his involvements with a female

23  inmate by the name of Bonnie Oolig, or Ooolid?  Did you ever hear

24  anything about the letter that was sent from him to her in the

25  same jail facility?

1     A    There was a letter sent to that judge to it.  That's all

2  I know.

3     Q    Okay, what did you hear about that?

4     A    Just that, they were just writin' letter and stuff, and

5  the judge, I guess the Judge Baker intercepted it because Kirk

6  was always down on that judge.

7     Q    Okay.  Was anybody aware other than Kirk that she was an

8  inmate in the same facility?

9     A    Ah, probably lots of people.

10    Q    Okay.  That's fair enough.  Are you aware of his threats

11 against Judge Baker?

12    A    Yeah, I've heard about 'em.

13    Q    Okay, what did you hear about 'em?

14    A    Just what, you know, him goin' off on the judge.  I was

15 in jail at the same time and I'd read it in the papers.  He'd go

16 off on the judge and --

17    Q    Okay.  Did you read those papers, keep track of what was

18 going on in the newspapers, while you were in custody?

19    A    Just my own case, and at that time I was fightin' two

20 counts first degree murder and two counts first degree kidnapping.

21    Q    Okay.  You say Kirk was keeping a file on you also?

22    A    I think so.

23    Q    You think so but you don't really know.

24    A    I really don't.  All I know is everybody in that place,

25 the paper was always tore up and he was always the first one in

1   it.

2       Q   Okay, so you really don't know if he kept anything on

3   anybody other than Brian.

4       A   No.

5       Q   Okay.  The things that he talked to you about, was it

6   material that might have coincided with the information that was

7   in the newspapers?

8       A   Kirk?

9       Q   Mm-hm.

10      A   Possibly.

11      Q   Okay.  Well, do you think that Kirk is capable of fabri-

12  cating a story for this purpose?

13      A   Ah, anything's possible.

14      Q   Okay.  That's a fair enough answer.  What's your person-

15  al opinion of him?  Think he's credible?

16      A   I really liked the guy.

17      Q   Hm?

18      A   I really liked the guy.

19      Q   Okay.  Would you say he would be an honest person, or a

20  liar?

21      A   Ah, shit, I don't even know.

22      Q   An opportunist?

23      A   Definitely an opportunist.  Everyone's an opportunist,

24  given the right opportunity.

25      Q   Okay.  Did he ever discuss Richelle Curtis with you

12

1    while he was in the facility?

2        A    No, I don't --

3        Q    Did he ever talk about a girl by the name of Vivian

4    Fell?  Okay.  Do you know David Lee?

5        A    Yeah, I knew him in jail.

6        Q    What can you tell me about David Lee?

7        A    Not much.  He's just another black I did time with.

8        Q    Okay.  Is he in there for first degree murder also?

9        A    Yeah.

10       Q    Okay.  When he was talking about running the guns, did

11   you feel he was credible when he was talking about it?

12       A    No.

13       Q    Why?

14       Q    'Cause he talked about it like, hey, it's just something

15   that happens every day.  Gun runnin' ain't something that happens

16   every day.  You don't go around carryin' an M-16 and automatic

17   weapons in the back of his trunk.  That was, ah, couldn't have

18   been.

19       Q    Okay.  Did he ever talk about the contract that he got

20   for killing two narc officers?

21       A    No.

22       Q    Never bragged about any of that?

23       A    Never knew nothing about it.

24       Q    Did he brag about the contract he got to kill Baker?

25       A    No.

13

1     Q  Okay.  Funny he seems to be the only one that wants to

2  talk about that one.  All right, Kirk had a fight in the jail.

3  Was that fight that they were talking about with you or did he

4  have a fight with someone else that you can recall?

5     A  It was someone else.

6     Q  Do you who it wa--, was that Larkins?  Michael Larkins?

7     A  I don't remember the guy's last name.

8     Q  Do you remember his first name?

9     A  No.

10     Q  Okay.  Was he black?

11     A  I think so.

12     Q  Okay.  Did you ever talk to an agent Kayser?  Mark Kay-

13  ser?

14     A  Shit, I don't know.  I don't remember.  Who's he from?

15     Q  Military Intelligence.

16     A  No.

17     Q  Did you ever talk with a special agent Zastrow?

18     A  No.

19     Q  Okay.  Have you ever heard of Linda Fifer?

20     A  Huh-uh.

21     Q  Were you aware or did you hear about a second murder in

22  Colorado Springs the same week that Brian's wife was killed?

23     A  No.

24     Q  Well, do you think that Michael is capable of killing

25  somebody?

14

1    A    Everybody is if you give 'em the chance.  Possible.

2    Q    Okay.  All right, is there anything else you can think

3  of?

4    A    Not really.

5    Q    Okay.  Can you think of any reason why he would accuse

6  you of instigating an approach, to break time for testifying in

7  Brian's case?

8    A    Yeah, it was, ah, I already got a reduction on the case

9  that I was on, and they wanted to know if anyone, who else was in

10  jail at the time Brian and us was there, you know, that he talked

11  to.  Kirk was the only other person that he really talked to.

12    Q    All  right,  so  they  approached you before they

13  approached Kirk?

14    A    Yeah.

15    Q    All right, and Kirk at no time told you that he was set-

16  ting up any kind of a story to get his charges reduced.

17    A    No.

18    Q    Or dismissed, in this case.

19    A    No.

20    Q    Okay.  So would you say that if we put both statements

21  as testimony that he gave to Brown on the stand where he said

22  Brian killed his wife in the affidavit that we now have, where he

23  says that it was just a fabricated story, which one would you

24  have a tendency to believe?  Being housed with him in the facil-

25  ity.

1    A   Kirk wrote that it was a fabricated story?

2    Q   Mm-hm.  I've got it notarized.

3    A   Then I'd tend to probably believe that.

4    Q   Okay.  Why?  I've got mixed feelings on him.  I didn't

5 house with him, so I've got to deal with somebody else's feeling

6 and thoughts on the subject.

7    A   Well, if he got his story from, you know, the story he

8 ran down to me, and he was gettin' duressed by the cops, and he'd

9 want out, too.

10    Q   Okay.

11    A   And if he was in the same place where he couldn't get

12 touched, then the truth would be no.

13    Q   Okay.  The only time that you saw him was just prior to

14 your being sentenced.  Am I correct?

15    A   Who?

16    Q   Kirk.

17    A   Ah, last time I saw him was, ah, back in October of '81

18    Q   Okay, and where were you and where was he at the time?

19    A   We was both ward reps in F Unit, El Paso County Jail.

20    Q   Okay.  Was there anybody else in there that you can

21 think of that celled with you two at the same time?

22    A   No.  Me and Kirk celled together, and everybody else was

23 locked in their own cells.

24    Q   Okay, do you know who else was in there with you two?

25 Other than Brian, Battles, and Justin Logan?

1      A   There were a lot of people in, but I can't remember.

2      Q   Okay.  All right, is there anything at all you can think

3  of?  As I said, right now what I'm looking at is I've got a man

4  who's sitting in Leavenworth, convicted of a murder charge of a

5  murder he didn't do.  And all the evidence right now points to

6  him, and it's just a matter of cleaning up the loose ends and

7  then going after who did kill her.

8         Okay.  I have nothing else, then.  I thank you much for

9  your time.  Appreciate your coming up.

10        Interview concluded 6/21, 1983, at 17:39 hours.

11        UNIDENTIFIED MALE:  The foregoing interview was between

12  Jeff Pubanz and inmate Chal Leipoldt, Delta Correctional Facility,

13  Delta, Colorado.

14

15

16

17               CERTIFICATE

18      The above and foregoing is a complete transcription of

19  the electronic recording taken at the time and place above set

20  forth.

21

22                *Kathryne L. Sandquist*

              KATHRYNE L. SANDQUIST

23

24

25